No. 22,683.

ETTA VASSAR et al., *Appellees,* v. SWIFT & COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. COMPENSATION ACT—*Injuries—No Notice of Accident Given Within Ten Days.* In an action under the workmen's compensation act, the answer was a general denial. On the trial it was shown that no notice of the accident was given to the employer within ten days as required by section 5916 of the General Statutes of 1915. No instructions were asked with respect to the question of notice and, the record failing to disclose that the question was called to the attention of the trial court, *held,* that it is too late to raise the question in this court.

2. SAME—*Evidence—Dying Declarations.* The rule, announced in *Thurston v. Fritz,* 91 Kan. 468, 138 Pac. 625, that dying declarations are admissible in civil cases, followed and applied in a workmen's compensation case.

3. SAME—*Questions of Fact for Jury.* The evidence is held sufficient to take to the jury the question of the declarant's fear of impending death and the question of the credibility of the declarations.

Appeal from Wyandotte district court, division No. 1; ED-WARD L. FISCHER, judge. Opinion filed May 8, 1920. Affirmed.

*Russell Field,* of Kansas City, Mo., for the appellant.

*W. W. McCanles, F. M. Kennard,* and *S. L. Trusty,* all of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

PORTER, J.: In a workmen's compensation case the plaintiffs recovered a judgment for $2,964 for the death of John Vassar. The defendant appeals.

The deceased, who was 53 years of age at the time of his death, had been in the employ of Swift & Company for eleven years; his work was loading refrigerator cars. It is claimed that his duties required him to lift heavy pieces of beef and that in doing so he strained his side, and because of the low temperature of the car, contracted pleurisy, which resulted in his death. The answer was a general denial.

The serious question of fact was, whether the deceased received any injury while in the employ of defendant that had anything to do with his death. The testimony of Etta Vassar, the widow, shows that on August 25, 1918, her husband came home at his usual time, about 3 o'clock in the afternoon; he was walking with his hand on his side and said he was awful sick and his left side was hurting him; he went to bed and she put hot applications on his side, rubbed it with turpentine and lard, and kept up this treatment for three days, when a physician was called. For a period of two weeks prior to his death he recovered sufficiently to be up and around the house and at times out on the back porch, and walked with a cane. Later he took to his bed again and died on October 26, about two months after the alleged injury.

Two physicians testified that pleurisy might result from a blow or bruise on the side where it is claimed the deceased was injured and that pleurisy developed in that manner might have caused his death. One of these physicians, Dr. Nason, treated the deceased from September 20 until his death. Dr. Nason made out the death certificate, which contained the statement that the cause of death was—

"Pleurisy, duration ten days; contributory, secondary, typhoid fever, four months."

He testified that the "four months" was a mistake and intended to be two months. He admitted that in certifying to

the cause of death he had not stated anything about an injury, and that in a conversation in reference to the matter with a claim agent from Swift & Company in January or February he had made no mention of injuries.

Dr. Barker was called to treat Vassar on August 28 and continued in charge of the case until the family called Dr. Nason on September 20. He testified that he diagnosed the sickness as typhoid; he described the finding of a tenderness in the area where it is found in such cases, and the rash on the abdomen and legs; for three weeks the patient had the typhoid temperature, reaching its maximum toward midnight and then graudally lowering until 7 or 8 o'clock in the morning, when it would gradually rise again.

He further testified:

"It ran a very typical typhoid fever course, and I treated him for typhoid condition and kept him on the liquid diet and kept him quiet and had them give him the usual baths when his temperature would run the highest. And the temperature usually yielded to that treatment. . . . gradually went down, after a period of two or three weeks. . . . Each morning it was a lower temperature, and it would go up, typical of a typhoid condition, but each subsequent day it would become a little less. . . . I examined practically all the functions of the body, and I could not find anything in that way that might cause this fever, except the typhoid condition. . . . found no symptom of any injury to the lung, or that of pleurisy at all. In fact, the respiration did not show any symptom of it."

Testifying as to the condition of Vassar when he left him on the 20th of September, he said that he found no tenderness on the left side covering the pleural cavity. The history of the case and the condition of the patient in his opinion showed that of one recovering from typhoid fever.

"He kept insisting on eating a whole lot of food. . . . I told him that he must stay off the solid foods for at least eight or ten days yet. . . . Relapses often follow in cases of typhoid fever. That is the way a good many people die from typhoid. . . . When I left this man he was almost well, but he was weak, decidedly weak, from this condition, but he was gaining."

The superintendent of the refrigeration department and the foreman in charge of the men with whom the deceased had been at work, and six of the workmen were witnesses. Several of these had known Vassar for many years. The six workmen were what is known as "luggers." The testimony of the

superintendent, the foreman and these workmen was to the effect that Vassar was what is known as a "hanger" of beef in refrigerator cars, and was engaged in "hanging" the fore quarters of beef which were carried into the car by luggers, and lifted up by the lugger and hung upon a hook fastened in the car. They testified that the only duty the deceased had to perform was to fasten this hook in the beef, and when he had done this to say, "Let go," when the lugger dropped the beef so that it hung suspended on the hook. Each of these witnesses testified he had no knowledge of any accident ever having happened to Vassar. His fellow workmen knew that he was absent from work, but understood that he was sick.

Fred Widener, who had been employed at Swift's for 22 years, and was well acquainted with the deceased, testified that about a month or six weeks before Vassar's death he visited him at his house for 15 or 20 minutes.

"He was sitting in the chair. He said nothing to me about having received an injury by accident. He said nothing to me about the cause of his sickness. He didn't say that he knew the cause."

The superintendent testified that it was his duty to investigate the cause of every accident for the purpose of avoiding a repetition of it and to discover who was responsible, and whether it was due to carelessness, and also to keep track of the wages of the injured employee and see that he got his compensation. The testimony is that the company had no notice of any claim that the deceased had ever been injured at the plant until January 17, 1919; that the witness inquired of every person about the plant who might know anything about such an accident, and was unable to find one who had ever heard of it or knew anything about it.

Mr. Larson, the foreman of the deceased, testified that it was his duty in case of an accident to make a report of it; that he had never heard of an accident to Vassar. He had known John Vassar about nine years.

"Mr. Vassar didn't have to lift beef; he didn't have anything to do with the lifting. . . . Mr. Vassar was a beef hanger all the time I knew him. I saw him nearly every day in the month of August, 1918. . . . My duties there are looking after the beef loading. . . . I have never known a beef to slip from the hook after it had been hooked. . . . In hanging the fore quarter a hanger has to puncture a hole between the third and fourth ribs, with the hook. . . . I never knew of a fore quarter

tearing loose when hanging up. . . . There is a hook hanging from the
ceiling, about eighteen inches long, and the hook is there in place already
on the wall, and it is his duty to hook that into the quarter when it is
carried in by the beef lugger."

One defense urged is, that no notice of any kind in reference
to the accident was given by the plaintiffs or by John Vassar.
It appears there was no reason why a notice could not have
been given. There was nothing in Vassar's condition to have
prevented it immediately after he quit work, and the evidence
is that he was up and around the house for two weeks before
his death. The workmen's compensation act (Gen. Stat. 1915,
§ 5916) requires that notice of the accident, stating time, place
and particulars thereof, shall be given within ten days after the
accident occurs, or the action cannot be maintained; but there
is a further provision in the same section that "The want of,
or any defect in such notice, or in its service, shall not be a bar
unless the employer proves that he has, in fact, been thereby
prejudiced."

The plaintiffs' contention that the defendant failed to show
prejudice is, we think, untenable. The uncontradicted evidence
is that it had no notice or knowledge of any claim of an acci-
dent until January 17, 1919. This was nearly five months after
its alleged occurence. If notice had been given within ten days,
when matters were fresh in the minds of the other workmen, it
is obvious that the defendant would have found it much easier
to have produced evidence to show whether, in fact, the de-
ceased sustained an accident. It was not necessary, of course,
for the defendant to produce a witness to state that defendant
sustained some prejudice. The facts about which there is no
dispute speak for themselves. The difficulty, however, is that
defendant never raised the question in the court below. The
answer was a general denial. There is nothing in the record
which indicates that the question of notice was called to the
attention of the trial court; no instructions were asked with
respect to the question of notice or plaintiffs' right to recover
by reason of a lack of notice, nor was the defense in any way
suggested or referred to in any of the instructions. Neither
the court nor the jury was called to pass upon the question.
The failure to raise the question below renders unnecessary
further comment upon the matter of notice.

The principal question of law involved is whether so-called dying declarations of the deceased were admissible in evidence. The foundation for the introduction of the declarations was the testimony of Mrs. Metheson, a neighbor, and Clyde Vassar, son of the deceased. Mrs. Metheson testified that Vassar's death occurred on Saturday and that on the previous Sunday she was over at his house and he was lying in bed twisting, holding his side, and groaning. The witness was there about thirty minutes; she sat down beside his bed and asked him how he felt.

"And he told me that he felt bad. He says, 'I am not sick. It is the pain that is killing me.

"Q. What, if anything, did he say about whether he thought he could live? A. He told me that he didn't expect to live. He said, 'This pain is so great that I cannot live.'"

Again she was asked:

"What further, if anything, did he say about his expecting to die? A. He says, 'The pain is so great,' he says, 'I cannot stand it.' He says, 'The doctors can do me no good.'

"Q. And did he make any statement as to whether he expected to die? A. He said that he didn't think that he could live.

"Q. (Relative to his thinking he would die) Just bearing upon that line, if you can think of anything more in the conversation that you had, about what he said about expecting to die. A. He told me the pain was so great—that he was not sick, but the pain was so great that he couldn't live; that he couldn't stand it; the doctor didn't seem to do him any good.

"Q. He said he couldn't live? A. Couldn't live.

"Q. Well, now, what further, then, did he say, if anything, as to how the accident occurred?"

The defendant objected on the ground that there was no proper foundation laid under any view of the case. The objection was overruled.

"Q. You may go ahead. A. He said that he didn't think that anything could do him any good, because he thought there was something bursted or broken in his side."

The witness was then permitted, over objections, to testify that the deceased said—

"He lifted a piece of meat and wrenched his side. He said something popped, like he was shot or something was broken, and he said he liked to never have gotten home."

Clyde Vassar, a son of the deceased, testified to a conversation that occurred about a week before his father died, and he

was asked to state what his father said "about getting well and whether he expected to get up." His answer was,

"Well, I went across the street to see him and I asked him how he felt. . . . he said he was feeling pretty bad—the pain was awful, and he didn't think he could ever stand it very long. And I asked him where he hurt; and he showed me down on his side—that is, just put his hand on his side.

"Q. Was anything stated about where he had gotten hurt or the manner in which he was injured?"

This was objected to for the reason that there was no foundation laid for the question. The court made no ruling, but counsel for defendant made further inquiry, as follows:

"Q. What, if anything, was said by your father, if anything more was said, covering whether or not he expected to live? (An objection was overruled.) A. He said he did not think that he would ever get well, and he said that he thought that the last day that he worked at Swift's— (Objection.)

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Giving his words, if you can, in substance, what did he say about his expecting to die? (No answer.)

"Q. Relative to his expecting to die, what did he say about that, if anything more? A. That is all he said.

"Q. Did he tell you how long he expected to live? A. No, sir; he didn't."

The witness was then permitted, over the defendant's objection, to testify that his father said—

"The last day he worked at Swift's, he was hanging beef in the car, and that some fellow come in with a quarter of beef and didn't hang it just right, and it was his duty to place it where it should be placed; and in moving the beef the hook sliped out of it, and as he went to catch it he raised his knee up some way, and wrenched his side. He said that was what he thought hurt him in his side."

On the next day, both witnesses who testified to the "dying declaration" were recalled. Mrs. Metheson, the neighbor, was asked if in the conversation she had testified to, the deceased made any reference to what the doctor had told him about his condition. The question was objected to, but the witness was permitted to testify that when he said that he was going to die, "I tried to cheer him up and tell him that he may not die, he said, yes, the doctor had told him that he could not live." Clyde Vassar, the son, was recalled, and the following question was asked him—

"Q. I will ask you, Clyde, if in the conversation you had with your father there, any reference was made to a statement of the doctor? (An objection was overruled.)   A. In connection with what I told yesterday, he said that the doctor had told him he could not get well."

Mrs. Etta Vassar, the widow, was recalled, and testified as follows:

"Q. Mrs. Vassar, I want to ask you if at any time before your husband died, if you heard the doctor tell him he could not live?   A. I did—"

There was no testimony to show whether this statement was made to the deceased shortly before his death or whether it occurred before or after the time of the alleged conversations with Mrs. Metheson and Clyde Vassar.

The plaintiffs rely, of course, upon the doctrine first announced in *Thurston v. Fritz,* 91 Kan. 468, 138 Pac. 625, that dying declarations are admissible in civil cases. The court felt that the time had arrived to declare that the rule limiting the admissibility of such declarations to criminal cases was one which had no reasonable basis to support it. The court is satisfied with the decision in that case, and the only question here is, whether sufficient foundation was shown for admitting the statement as a dying declaration. We think it must be held that the evidence was sufficient to show that the statement was made by the deceased at a time when he was under a sense of impending death. It has been held that it is not necessary that the declarant state that he is expecting immediate death, and that where there is evidence that he had abandoned all hope and regarded his death as impending and certain, sufficient is shown to take to the jury the question of the declarant's fear of impending death and the question of the credibility of the declaration. (*The State v. Smith,* 103 Kan. 148, 174 Pac. 551, and cases cited in the opinion.)

It follows that the judgment is affirmed.