No. 22,969.

LOUISE HELM, *Appellee*, v. WALKER D. HINES, as Director-General of Railroads, *Appellant*.

#### SYLLABUS BY THE COURT.

NEGLIGENCE — *Closing Door of Vestibule — Neither Gross Negligence Nor Wantonness of Employee Shown.* A vestibuled train stopped in the nighttime at a station for two or three minutes. About the time it started a passenger got off the front end to go back to the rear, and while the train was in motion attempted to get on at a vestibule just as the door was closed. When the train had gained a headway of about fifteen miles an hour, he jumped or fell from the vestibule step; rolled under the train and death resulted from his injuries. On the facts stated in the opinion, *held*, there was no evidence to show gross negligence or wantonness of the employee who closed the door of the vestibule.

Appeal from Republic district court; JOHN C. HOGIN, judge. Opinion filed February 12, 1921. Reversed.

*Luther Burns, John E. Dumars*, both of Topeka, and *W. D. Vance*, of Belleville, for the appellant.

*N. J. Ward,* and *E. S. Nelson*, both of Belleville, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The Chicago, Rock Island & Pacific Railway Company appeals from a judgment in favor of plaintiff for damages for the death of her son, Keith Helm, which it is claimed resulted from the gross and wanton negligence of the employees of the railway company.

Keith Helm, twenty-two years old, was traveling with the Busse Carnival Company and conducted what is known as a "doll-rack" concession. The accident resulting in his death occurred at Cuba, a small station about ten miles east of Belleville. The regular train consisted of a combination mail and baggage car attached to the engine, an ordinary baggage car, a smoking car, a chair car and a Pullman sleeping car. The regular equipment constituted a solid vestibule train; the smoker, chair car and sleeper were vestibuled, but the mail and

Helm v. Railway Co.

baggage cars were "blind"; that is, there was neither step nor platform at the ends of these cars.  Attached to the regular train at the rear of the Pullman were two cars owned by the carnival company which carried the eighteen people comprising the personnel of the company.  These cars are referred to as the "show cars," one being a diner and the other a sleeper.  Neither was vestibuled.

The train left Belleville about 10:40 p. m. on September 1, and arrived at Cuba about 11 o'clock, where it stopped for a moment or two, long enough to take on three passengers and baggage and mail.  The train started and had gained a speed of about fifteen miles an hour when the station agent discovered a man clinging to the handrails of a closed vestibule with his feet on the lower step.  The man was seen to jump or fall to the platform, lose his balance and roll with his feet under the wheels of the train.  Mr. Hoover, the station agent, was the only eyewitness to the accident and was called by the plaintiff as a witness.  The substance of his testimony is that there were five lights in the station building which shone out on the platform; the engine stopped seventy-five feet east of the station; the show cars were west of the depot about 130 feet; there was nothing unusual in connection with the movement of the train, in its approach, its stop or its departure; the smoker stopped next the station, and ahead of the smoker were the baggage and mail cars; after the witness had placed the mail on the train he came back in a westerly direction toward the station and saw the lantern of the conductor and the porter at their usual places; as the train was leaving and had gained a speed of about fifteen miles, the witness saw a man clinging to one of the cars with his feet upon the step, holding to the handrails.

"Q.  Was he holding on the handrails?  A.  Yes, sir.
"Q.  Was his feet on the steps?  A.  Yes, sir."

The witness testified that he tried to catch the man to keep him from going under the train as he stepped off, and that the man was whirling.

"Q.  How long did he whirl on his feet or try to get his footing before .

he went under the train? A. He whirled for a distance of about 8 or 10 feet; . . . with the train going east.

"Q. And you tried to catch him? A. He was falling as he went by me.

"Q. And then he went under the wheels? A. Yes, sir."

He was asked as to what car ran over the young man and answered, "I rather think it was the Pullman." He was asked to describe to the jury how the man was clinging to the side of the car when he first saw him, and his actions until after the train had passed over him. He answered:

"As the train was leaving the station I saw some young fellow standing on the steps and holding to the hand rods on the steps of the car door in the vestibule and the door was closed, I saw that he was going by the depot in the light and as the train gained speed and as he came nearer to me, he dropped or stepped off and lost his balance and fell—

"Q. Go ahead. · A. He stepped off backwards and lost his balance and fell, and whirled and fell down and rolled under the wheels.

"Q. About what car and at which of the vestibules was this young man hanging? A. I believe to the vestibule door on the front end of the Pullman, I am not positive.

"Q. As a matter of fact was it not the rear of the day coach next to the Pullman? A. It was between the two cars, I am not real positive just which one of the two it was.

"Q. But it was one of the two, was it? A. It was one of the two.

"Q. This young man then was not at the back end of the Pullman was he Mr. Hoover? A. No, sir.

"Q. Did you see anybody in the vestibule as the train passed by, that is, the vestibule of the car to which this young man was clinging? A. No, sir.

"Q. Did you see anybody around there? A. No, sir.

"Q. Did you see or hear any door as the young man approached from a distance of 30 or 40 feet back? A. No, sir.

"Q. Was the door closed when you first saw him? A. Yes, sir.

"Q. Was there any door opening closed at the moment the young man stepped off of the car? A. No, sir."

He was asked the following question:

"Q. Did you make any outcry as the train was passing along? A. Yes, sir.

"Q. What did you say? A. I said, 'My God man, look out.'"

The train was making the usual roaring noise as it went by the station. Young Helm was taken to a hospital at Belleville where his wounds were dressed. He died within five hours

after the accident.   He made statements shortly before his death which were admitted in evidence under the theory that they were dying declarations in conformity with the rule declared in *Thurston v. Fritz*, 91 Kan. 468, 138 Pac. 625, and *Vassar v. Swift & Co.*, 106 Kan. 836, 189 Pac. 943.   Three physicians who were present testified that the young man stated several times, "I am done for."   The recollection of the physicians as to his statements varied in some particulars.   Doctor Dittemore testified in substance that when Doctor Welch asked the young man how it happened, he said that he went forward to get either some water or some food for one of the party who was sick and "when he went to get back on the train, the door was shut in his face."

"Q.   Did he say what became of him when the door was shut in his face?   A.   I don't recollect."

Doctor Mumford testified in substance that when asked by Doctor Welch how the accident happened the young man said he went through the train to get some fruit for a sick boy and "they would not allow him to go back through the Pullman and he got off and when he went to get on, why they closed the door on him."

Doctor Welch testified:

"After he had stated, I am done for, I asked him, where do you reside? He said his people lived at Omaha and I took down the proper number of his mother's address and where a telegram or letter would reach her. Then the next question I asked him, I says, how did you come to get hurt, and he said that he went to get on the train at the vestibule and the porter slammed the door in his face and he fell off.  I said, how did you come to be there, how did you come to be up in front there; and the next statement was that he went up there to get some fruit or some water for some showman on the train that was sick.   Then I asked him why didn't you go through the train, and he said that they would not let him go back through the sleeper, I believe, or something like that; then I said, why wouldn't they let you do that, and he said the door was closed or locked or something, and then I said, how did you come to be off, or why did you get off the train, or something like that, and I don't remember now just what I said, but he said he got off and the train started and he intended catching it back quite a ways but he was afraid the train would be moving too fast and he grabbed hold the first place he could to try to get on."

Dorothy McBride testified that she and Clara Foley, members of the carnival company, and Keith Helm were riding together on the front platform of the show car next to the rear

vestibule of the Pullman. As the train approached Cuba, Helm said he was going after some fruit for a man that was sick, and he went on ahead through the train. She saw him enter the Pullman and she never saw him after that. She heard a door slam after the train had started; it was on the side of the car next to the station. The noise caused by the closing of the door was loud; it was heard above the roar of the train. When witness heard the door close the train employee opened the door again; when the door opened the second time witness heard groans and cries; they were loud, as if someone were in pain, and seemed to come from under the wheels. Witness was standing on the bottom step and was facing the show car and had turned and was looking up in the direction of the railway employee. She looked down as she heard the sounds and saw a white object under the wheels. She was then passing by the station. After she heard the sounds she went into the coach and learned that some of the other people had heard the cries and were talking about them. Witness thought some accident had occurred. After closing the door the second time the man in uniform talked to all of them generally and stated that most likely Helm had been left at Cuba; he had been missed at the time by the people in the carnival car, and they were looking through the train for him. After hearing the groans and after seeing the white object under the wheels the witness told the man in the uniform that she had seen something under the wheels. In answer to the question, "What did he do then or say?" the witness testified: "Well, he looked as if he knew something that he didn't want us to know, or something of that sort." The latter testimony was admitted over the objection of the defendant. The same witness testified on cross-examination that she had often heard vestibules opened and closed, and that there was nothing unusual or different from any other closing of a vestibule door, and that the train was running pretty fast and was picking up speed as it was leaving the station where the noise and groans were heard under the car.

Clara Foley testified that the vestibule door was closed as "we were starting to pull out of Cuba"; just after passing a man who was standing on the platform the door was opened again and closed; she did not see anybody at that time hanging or clinging to the side of the Pullman door.

The defendant's evidence showed that in the vestibule cars in question the top of the steps was covered by the vestibule, but there is a place at the bottom where one can stand and hold to the handrails at the side, and that all vestibule cars are alike in this respect.

The allegation of negligence in the petition is that while Keith Helm was rightfully a passenger on the train, he was with force ejected therefrom by the employees of the defendant while the train was in motion; that either while being wrongfully ejected from the train or while trying to get back on the train immediately after such ejection, "this plaintiff is now unable to state exactly," one of the servants of defendant "willfully and with the intent to injure the said Keith E. Helm, and without any reason therefor shut the door of the passenger coach in his face and forcibly threw him from the steps of the said train" when he "was trying to enter the coach, and he was thereby precipitated underneath the train," and that his ejection from the train "was done by the said agents . . . wantonly and in utter disregard of his rights and knowing that there was great danger." of his being seriously injured or killed by being thus ejected from the train while it was in motion.

To avoid the negligence of Helm in attempting to board the train while it was in motion, plaintiff alleged and attempted to establish gross negligence or wantonness on the part of the trainmen. It was the duty of the employees to close the doors of the vestibule as the train started, and the mere fact that the door was slammed shut in the face of Helm would not, of itself, show negligence, nor would the fact that it was closed with a loud noise indicate negligence. Vestibule doors are usually closed with a slam and with noise. The testimony of the plaintiff's witnesses show that there was nothing unusual in the manner in which the vestibules were closed on this occasion. Ordinarily the train employees would have no reason to expect that after the train had started a passenger would attempt to board the train. Plaintiff was obliged to produce proof which would justify the jury in finding that the employee who closed the vestibule door knew that someone was trying to enter the train at that place. It is not clear just where the deceased left the train. It is known that he was up in the smoker at the head of the train, where he purchased

some fruit. The trainmen testified that none of the doors were locked during the stop at Cuba, and that no employee interfered with or prevented Helm or any other passenger from going through the Pullman or through the train. Assuming, however, that some door was locked which prevented Helm from going back through the train, that would not justify his getting off the train and risking his life in the manner in which he did. There is no evidence, however, to show that the person who closed the door saw or knew that Helm was attempting to get on the train. The accident occurred in the nighttime, and the only eyewitness testified that when the train had attained a speed of about fifteen miles an hour he saw Helm standing on the steps of the vestibule holding to the handrails, and that he was in this position for a distance of thirty or forty feet west of where the witness stood, and that the vestibule door was closed during all the time that the witness saw him. In our opinion, no facts shown in the evidence justified a finding that the employee who closed the vestibule door knew that anyone was trying to enter the train at that place.

Wanton or gross negligence could be imputed to the defendant only by conjecture, or by piling inference upon inference and presumption upon presumption. In the case of *Hart v. Railroad Co.*, 80 Kan. 699, 102 Pac. 1101, it was said that it was necessary for the plaintiffs to establish *prima facie* that the defendant was guilty of negligence which caused the death of their son. The only act of negligence charged in that case was that the door of a vestibule was open. In the opinion it was said:

"But the testimony is absolutely silent as to when, where or how that door was opened. It has been urged that but two agencies can be supposed to be responsible for this—the negligent conduct of the defendant's employees, and the deceased himself." (p. 701.)

The plaintiffs in that case attempted to rely first upon the presumption that the deceased was not negligent, because he did not want to commit suicide, and then, upon this presumption, to base another to the effect that it must have been the negligence of the defendant's employees. In the opinion it was said:

"This, of course, is mere conjecture, and only serves to show the extent to which speculation may run, where there are no facts by which it is guided or limited." (p. 701.)

In *Rodgers v. Railway Co.*, 97 Kan. 318, 154 Pac. 1027, a passenger in some unknown manner met with an accident, resulting in his death; his body was found near a water tank with his legs severed below the knees. Judgment was rendered for the defendant, which on appeal was affirmed. After reviewing earlier cases, it was said in the opinion: .

"We may give full force to the presumption of care on the part of Rodgers, but this presumption furnishes no basis for inferring negligence on the part of the defendant. Until proof to the contrary is introduced, the defendant is entitled to the presumption that it was exercising care and performing its duty toward the deceased. (*Looney v. Metropolitan Railroad Co.*, 200 U. S. 480, 26 Sup. Ct. Rep. 303, 50 L. Ed. 564.) Inference of negligence may be based on circumstances, but the circumstances must be drawn from premises that are reasonably certain and point clearly to the negligence asserted. In this respect the testimony of the plaintiff fails. As was said in *Railroad Co. v. Aderhold*, 58 Kan. 293, 49 Pac. 83: 'The accident may be accounted for in several ways, and other and more plausible theories of the collision may be suggested; but liability cannot be fixed on a bare guess, nor can a verdict rest on mere conjecture. (p. 298.) '." (p. 324.)

To the same general effect see *O'Keefe v. Street Railway Co.*, 93 Kan. 262, 144 Pac. 214; *Willis v. Skinner*, 94 Kan. 621, 624, 147 Pac. 60. .

We cannot agree with counsel for plaintiff that one of the important controversies in this case is whether some employees of defendant refused to permit Helm to return through the train. If that were established as a fact it would not warrant the presumption of even ordinary negligence on the part of the flagman or the porter in closing the vestibules when the train started. Plaintiff would still fail in the absence of testimony tending to show that the employees who closed the door of the vestibule knew or should have known the dangerous situation in which Helm was placed, or proof showing that it was the duty of the employee who saw Helm leave the train to prevent it from starting until he was again safely on the train. It is said that the court tried the case upon this theory. It is not the theory upon which the petition was drawn. The specific charge of negligence in the petition is that Helm was either wrongfully ejected from the train or while trying to get back on the train after such ejection, an employee of defendant willfully and with the intention of injuring him, and without any reason therefor, shut the door of the vestibule in his face and

forcibly threw him from the steps of the train; that the ejection of Helm was done by the employees of the defendant wantonly and knowing that there was great danger of his being seriously injured or killed. The specific negligence charged must be established by evidence. (*Byland v. Powder Co.,* 93 Kan. 288, 144 Pac. 251; *Gamble v. Oil Co.,* 100 Kan. 74, 163 Pac. 627.)

It is, of course, a fair presumption that if some door was locked which prevented Helm from returning through the train, it was locked by someone in authority as plaintiff argues, but plaintiff cannot upon this presumption base another presumption that the employee who locked the door or who prevented Helm from passing back through the train knew that Helm afterwards left the train and was attempting to reach the rear of the train while it was starting.

It is argued in plaintiff's brief that because the porter testified that no one was seeking to get on at the chair car when he closed the vestibule "therefore it is a fair inference, if not a conclusive inference, that it was at the rear of the Pullman" that Helm was seeking to get on, and it is further said that this follows as a natural inference because Helm's deathbed statement was positive "that he went to get on the train at the vestibule and the porter slammed the door in his face and he fell off." But there was only one train porter and it was he who opened and closed the vestibule of the chair car. The other vestibule was closed by the flagman whose duty it was to stand at the rear of the Pullman to protect the rear of the train and open and close the vestibule there. Besides, the testimony of the flagman was just as positive that there was nobody attempting to get on at his vestibule when he closed it which he did when 100 feet west of the station. There can be no dispute over the fact that the rear of the Pullman stopped at least that far west of the station; nor can there be any dispute over the fact that the porter and the flagman closed the doors just as the train started. The flagman testified that when he looked out the second time he was past all the lights of the station. Moreover, the plaintiff's argument ignores Helm's statement to Dr. Welch that he saw there would be no chance for him to get on at the rear and he attempted to grab the first place that he could.

But the negligence charged was not the failure of defendant's employees to hold the train until Helm could get safely on at the

rear.   It was alleged that the door of the vestibule was willfully and wantonly closed by an employee who knew that Helm was on the steps and trying to enter the train.   It must be held that there was an entire failure of evidence showing gross negligence or wantonness on the part of any employee of the defendant as charged in the petition, and that it was error to refuse to sustain the motion for a directed verdict.   We deem it unnecessary to pass upon other claims of error with respect to the admission of testimony.

The judgment is reversed and the cause remanded with directions to enter judgment for the defendant.

---

## OPINION DENYING MOTIONS TO DISMISS AND FOR REHEARING.

### SYLLABUS BY THE COURT.

1. MOTION TO DISMISS APPEAL—*Want of Jurisdiction—Motion for Rehearing—Judicial Notice of Acts of Congress and Proclamations of President—Waiver—Estoppel—Substitution.* On February 27, 1920, a judgment was rendered against Walker D. Hines, director-general of railroads, for damages.   On February 28, an act of congress was approved terminating Federal control of railroads to take effect on March 1, 1920, with a provision that pending causes of action against the director-general should not abate by reason of such termination but might be prosecuted to final judgment, substituting an agent to be designated by the president within thirty days after the passage of the act.   On the 11th day of March, 1920, the president by proclamation designated Walker D. Hines, director-general of railroads, as such agent.   The appeal from the judgment was not perfected until April 27, 1920, and was taken in the name of Walker D. Hines, as director-general and not as agent. On May 14, 1920, the resignation of Walker D. Hines, as director-general and as agent, was accepted to take effect on May 18, and the president by proclamation appointed John Barton Payne director-general of railroads and as such agent.   After a judgment in this court overruling the judgment in the lower court and ordering judgment in favor of the defendant, the plaintiff filed a motion to dismiss the appeal on the ground that this court had no jurisdiction of the appeal.   *Held:*

   (*a*) The courts take judicial notice of the acts of congress and of the proclamations of the president, and if attention had been called to the change in the designation of the defendant the court would have made formal orders of substitution.

   (*b*) The court having inherent jurisdiction of the subject matter of the controversy, jurisdiction of the parties may always be waived, and it is too late for the plaintiff after entering her appearance and contesting the appeal on its merits to question the court's jurisdiction.

(c) Coupled with the motion to dismiss is a motion for rehearing, which fact of itself precludes plaintiff from raising the question of jurisdiction, and in the furtherance of justice the court directs that an order of substitution be made.

The opinion of the court was delivered by

PORTER, J.: Since the decision in this case was handed down reversing a judgment in plaintiff's favor and ordering judgment for the defendant, the plaintiff has filed a motion to dismiss the appeal on the ground that this court never acquired jurisdiction of the case and that all proceedings here are void.

The accident out of which this lawsuit grew occurred on September 1, 1919, when Walker D. Hines was the director-general of railroads. The motion for a new trial was overruled and judgment was rendered in plaintiff's favor on the 27th day of February, 1920, one day prior to the act of February 28, 1920, providing that Federal control of railroads should terminate on the 1st day of March, 1920. The notice of appeal was not served and filed until April 27, 1920, and it was served in the name of Walker D. Hines, as director-general of railroads.

Section 206 (a) of the act of February 28 contained a provision that actions of this character arising out of the possession, use or operation, by the president, of the railroads might be brought against an agent designated by the president for such purpose, which agent the president should designate within thirty days after the passage of the act. (U. S. Stat., 66th Cong., p. 461.)

Section 206 (d) of the same act reads:

"Actions, suits, proceedings, and reparation claims, of the character above described pending at the termination of Federal control shall not abate by reason of such termination, but may be prosecuted to final judgment, substituting the agent designated by the president under subdivision (a)." (Id. p. 462.)

On the 11th day of March, 1920, the president issued his proclamation designating Walker D. Hines, director-general of railroads, and his successor in office, as such agent. Walker D. Hines tendered his resignation as director-general of railroads, and as agent, to become effective May 18, 1920, which was duly accepted by the president. On May 14, 1920, the president issued two proclamations, one appointing John Barton Payne director-general of railroads, and another appointing John

Barton Payne, director-general of railroads, as the agent provided for in section 206 (*a*) of the act of February 28.

It is the plaintiff's contention that on April 27, when the appeal was perfected, Walker D. Hines was no longer acting as director-general of railroads, and that the appeal should have been taken in his name as agent instead of as director-general, and further, it is contended that when his resignation as director-general took effect on May 18, 1920, the name of John Barton Payne, director-general of railroads, as agent, should have been substituted in this court for that of Walker D. Hines.

There are several reasons why the motion cannot be sustained. It is doubtless true that before serving the notice of appeal, an order of substitution should have been procured in the lower court, describing the defendant as Walker D. Hines, director-general of railroads, and agent. But, the courts of this state take judicial notice of the acts of congress (*Dana v. Hurst*, 86 Kan. 947, 949, 122 Pac. 1041), and of the proclamations of the president (*Jenkins v. Collard*, 145 U. S. 546, 36 L. Ed. 812) ; and if the attention of this court had been called to the change in the designation of the defendant by the proclamations of the president, the court would have made a formal order of substitution, and later, if attention had been called to the proclamation of May 14, another formal order would have been made substituting John Barton Payne, director-general of railroads, as agent. The plaintiff, however, is estopped to urge the question of jurisdiction. Under the constitution this court has inherent jurisdiction of the subject matter of appeals from the district court, and where a court has inherent jurisdiction of the subject matter of a controversy, jurisdiction of parties may always be waived. It is too late for the plaintiff, after entering her appearance and contesting the appeal on its merits, to question the jurisdiction of this court to render a decision against her. It has been settled that a person who proceeds in a suit, and takes an order or decree therein without revivor, is estopped to object for want of revivor. (*M'Neil v. M'Neil*, 170 Fed. 289, 291.) The plaintiff is in the position of asking the court for a decree affirming the judgment without calling the court's attention to the want of substitution of parties, and after being defeated on the merits, is precluded

from raising the objection. A different rule, of course, would obtain in the case of a defective jurisdiction over the subject matter. As said in *Rago v. Veneziano,* 155 Ill. App. 557, 559:

"The infirmity pointed out rests in irregularity of procedure. No objection being made to such irregularity, it is waived." (p. 559.)

It is not claimed, nor could it be claimed, that on the trial of the merits the plaintiff suffered the slightest prejudice by reason of the failure to technically describe the office of the defendant. The civil code, section 141, declares that "any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party must be disregarded." And section 140 provides:

"The court or judge may, before or after judgment, in furtherance of justice and on such terms as may be proper, amend any pleading, process or proceeding by adding or striking out the name of any party, or correcting a mistake in the name of a party, . . . when such amendment does not change substantially the claim or defense."

Coupled with the motion to dismiss is a motion for a rehearing. The plaintiff has again placed herself in a position which alone would preclude her from questioning the jurisdiction of the court to make an order of substitution or any other order in the furtherance of justice. It has been held that where judgment is entered against defendants over whom the court has no jurisdiction, and they afterwards voluntarily request the court to open the judgment with permission to plead, and the request is granted and pleadings are filed, the parties are before the court for all purposes. (*Aherne v. Investment Co.,* 82 Kan. 435, 108 Pac. 842.) In *Woodhouse v. Land & Cattle Co.,* 91 Kan. 823, 139 Pac. 356, it was held that procuring a stay of execution precludes a defendant from afterwards challenging the judgment as void for defective service of process. In a case where judgment was taken against minors on default, and eight years after the youngest had reached majority, the heirs moved to vacate the judgment because they had not been legally served, and also because the petition did not state a cause of action, it was held that the last ground of the motion constituted a general appearance and cured any defective service of summons. (*Barnett v. Insurance Co.,* 78 Kan. 630, 97 Pac. 962.)

In *Gundlach v. Chicago & N. W. Ry. Co.,* (Wis.) 179 N. W. 577, there was a judgment against the director-general for in-

juries sustained while the railroad was under Federal control. On motion the mandate was amended with directions to substitute John Barton Payne, agent designated by the president under the transportation act of 1920, as sole defendant, and to render judgment against the substituted defendant.

The motion for rehearing presents the same questions urged in the original briefs and at the oral argument and which were fully considered at the former hearing. The motion to dismiss and the motion for rehearing are denied, and, in the furtherance of justice, an order of substitution is directed. The mandate will therefore read as follows: Judgment reversed and the cause remanded with directions to substitute "John Barton Payne, agent designated by the president under the transportation act of 1920," as sole defendant, and to enter judgment in favor of the defendant for costs.