No. 32,841

THE CITY OF PITTSBURG, *Plaintiff,* v. GEORGE ROBB, as State Auditor, etc., *Defendant.*

(53 P. 2d 203)

Opinion filed January 13, 1936.

*B. W. Weir,* of Pittsburg, and *Robert B. Fizzell,* of Kansas City, Mo., for the plaintiff; *Justin D. Bowersock,* and *John F. Rhodes,* both of Kansas City, Mo., of counsel.

*Clarence V. Beck,* attorney general, and *Theodore F. Varner,* assistant attorney general, for the defendant.

*Charles L. Hunt, Frank C. Baldwin,* both of Concordia, *P. E. Nulton* and *R. L. Letton,* both of Pittsburg, as *amici curiae.*

The opinion of the court was delivered by

BURCH, C. J.: The action is an original action of mandamus in this court, by the city of Pittsburg, to require George Robb, the state auditor, to register revenue bonds of the city voted pursuant to chapter 32 of the Laws of 1933, Special Session. The cause is submitted on the pleadings. The answer of the auditor questions original validity and present effectiveness of the statute.

To cope with consequences of economic depression then existing, congress passed the national industrial recovery act, which was approved on June 16, 1933. The act consisted of three titles: Title I related to industrial recovery; Title II related to public works and construction projects; Title III contained amendments of laws and miscellaneous provisions. Section 303 of the act reads:

"If any provision of this act, or the application thereof to any person or circumstances, is held invalid, the remainder of the act, and the application of such provision to other persons or circumstances, shall not be affected thereby."

. Title II authorized the president to create a federal emergency administration of public works which, among other things, might finance or aid in financing public works, consisting of publicly owned facilities and instrumentalities. Contemplated methods of financing were outright grants of money, and purchase of obligations of municipalities, issued for construction or improvement of public works. Three billion three hundred million dollars was appropriated to carry out the provisions of the act. The president was authorized, in his discretion and under such terms as he might prescribe, to extend the benefits of the act to any state, county or municipality, notwithstanding constitutional or legal restriction or limitation on the right or power of the state, county or municipality to borrow money or incur indebtedness. (National Industrial Recovery Act, § 203, subdiv. [d].)

In this state municipalities are creatures of state legislation, and their power to borrow money and to create indebtedness cannot be enlarged either by congress or by the president. The regular session of the 1933 legislature had given considerable attention to the subject of municipal indebtedness. One act was the cash-basis law, requiring municipalities to compile a complete, detailed financial statement by a named date, to pay or to refinance their indebtedness in a way prescribed by the act, and to conduct their financial affairs

in the future on a cash basis. (Laws 1933, ch. 319, effective March 31, 1933.) In view of the penalties prescribed for violation of the act, it was not likely municipalities would embark on what, under the law of this state, would be lawless creation of indebtedness. If they did, they would not get very far. Therefore, in order that municipalities might take advantage of the act of congress, and so coöperate with the federal government in achieving the purpose of the national industrial recovery act, a special session of the legislature was called by the governor. One of the measures adopted was chapter 32 of the Laws of 1933, Special Session, effective December 5, 1933, authorizing municipalities to issue and sell a special type of bond called "revenue bond," to pay the cost of constructing, reconstructing, repairing, improving and extending publicly owned utilities. Section 5 reads:

"Bonds issued under this act shall not be sold for less than the principal amount thereof and accrued interest at the rate of four percent, and shall not be offered for sale to nor purchased by the state school-fund commission. Such bonds may be sold to the government of the United States, or any of its agencies, under the provisions of the national industrial recovery act, or other federal law, and regulations made in pursuance thereof, on such terms and conditions, not inconsistent with the provisions of law, as in the judgment of the governing body or other proper officers of any such municipality will be in the best interest of such municipality."

Desiring to extend and improve the waterworks system which it owned, the city of Pittsburg voted bonds for the purpose in the sum of $125,000. The proceedings were regular in all respects, but, as indicated, the auditor declined to register the bonds, a condition precedent to sale of the bonds.

It is contended the act is unconstitutional and void as delegating legislative power. The contention is based on the following section:

"This act shall become ineffective with the expiration of the national industrial recovery act and amendments thereto." (Laws 1933, Special Session, ch. 32, § 11.)

Title II of the national industrial recovery act begins with section 201. Subdivision (d) of that section reads:

"After the expiration of two years after the date of the enactment of this act, or sooner if the president shall by proclamation or the congress shall by joint resolution declare that the emergency recognized by section 1 has ended, the president shall not make any further loans or grants or enter upon any new construction under this title, and any agencies established hereunder shall cease to exist and any of their remaining functions shall be transferred to such departments of the government as the president shall designate: *Provided,*

That he may issue funds to a borrower under this title prior to January 23, 1939, under the terms of any agreement, or any commitment to bid upon or purchase bonds, entered into with such borrower prior to the date of termination, under this section, of the power of the president to make loans."

The argument is, existence of a law of this state depends not on action of the legislature, but on action of congress or action of the president, and consequently the legislature delegated to congress and to the president legislative power of this state.

The doctrine that the legislature may not delegate its power of lawmaking originated with John Locke. (Second Treatise on Civil Government, ch. 11.) The constitution of this state was framed in accordance with the doctrine. What follows will not be a treatise on the subject. Unctuous repetition or sonorous rephrasing of the dogma leads us nowhere. The question in a given case is, Was what the legislature did a delegation of its lawmaking power?

Effectiveness of a statute may be made to depend on occurrence of some fact, event or contingency. In such cases the act must be complete in itself as an expression of the legislative will, and must itself determine propriety and expediency of the measure. These requirements being satisfied, a statute may provide that its operation shall be conditional.

That the legislature must determine expedience is illustrated by the recent decisions of this court relating to extension of the moratorium law. The legislature created a moratorium of six months. The legislature then left it to the judgment of the governor whether the moratorium ought to be extended six months more. If what the legislature did with respect to the first six months was legislative, what the governor was authorized to do with respect to the second six months was equally legislative. (*Oakland State Bank v. Bolin,* 141 Kan. 126, 40 P. 2d 437; *Langworthy v. Kadel,* 141 Kan. 250, 39 P. 2d 443.)

The principle that effectiveness of an act may be made to depend on the coming into existence of some specified future fact, event, or condition capable of identification or ascertainment, has been applied numerous times by this court. An early case illustrating the principle is that of *Phoenix Ins. Co. v. Welch,* 29 Kan. 672 (1883). The legislature passed an act relating to insurance. A reciprocity provision was, that if the existing or future laws of any other state should impose on Kansas insurance companies seeking to do business there heavier burdens than those imposed by this state, this

state should impose equal burdens on companies coming here from other states. The proper amount of fees, charges, etc., was to be paid to the superintendent of insurance, the licensing officer. The statute was held to be constitutional. Pertinent paragraphs of the syllabus read:

"While the legislative power of the state is by the constitution vested in the legislature, yet that body has authority to pass a law whose operation is by its terms made to depend on a contingency, even though that contingency be some action on the part of the legislature of another state.

"Section 17 of the act relating to insurance (ch. 50a, Comp. Laws 1879), so far as it provides that, when the laws of any other state impose upon the corporations of this state applying to transact business within its limits other and more onerous burdens and conditions than those prescribed by the general provisions of said chapter for corporations seeking to transact business in this state, the same burdens and conditions shall be imposed upon corporations from that state applying to enter this, is a complete and absolute expression of the legislative will, and though its operation depends on the contingency of legislative action in other states, it is not thereby rendered unconstitutional." (1, 2.)

In the opinion by Brewer, J., it was said:

"Now in this section is absolutely and finally prescribed the rule and measure of license. It is not left to the state superintendent to determine what the rule shall be. His duty is simply to ascertain the facts, and apply the rule. He may not arbitrarily determine upon what conditions the plaintiff may enter this state; he can only enforce the condition which the legislature has imposed. It is true the extent of those conditions may vary in different cases, but the rule to determine the variance is not left to his judgment, but is prescribed by the legislature. Our laws abound in cases in which a statute is made dependent upon the action of some tribunal or body, or upon some other contingency, and is therefore practically dormant until such action takes place or contingency happens. (Enumeration of laws.) . . .

"But it is said that the contingency is the action of the legislature of a foreign state—that in effect the section attempts to transfer the law of such foreign state to our own, and make it operative within our territorial limits. Not so: the section is the law of Kansas, enforced solely within our limits, and in enforcing it the superintendent is only obeying the mandate of our legislature. True, the contingency is created by the action of a foreign state, and the section refers the superintendent to the legislation of that state to determine whether the contingency has arrived. But this is not the only instance in which our legislation refers to that of other states, . . . (Citations). . . .

"In all these cases it is the law of the home government which is enforced, and the action of the foreign government only makes the contingency upon which the law becomes operative. There is no difference in principle between such contingency and any. other which may be provided for in the statute. In all such cases it is the duty of the officer charged with the execution of the law

to inquire as to the facts, and ascertain whether the contingency named has arrived, and if so, to enforce the mandate of his superior, the legislature." (pp. 676-678.)

It will be observed that under this decision effect of a statute may be quite contingent, according to existing law of another state, according to future law of another state, and according to change in the law of another state.

A different view of the constitutional question involved was presented in the opinion by Somerville, J., in the case of *Clark & Murrell v. Port of Mobile*, 67 Ala. 217 (1880), a reciprocal insurance case arising under a law quite similar to that considered in the Kansas case:

"This section of the Code authorizes, in effect, the legislature of Mississippi, speaking through its statutes, which are the subjects of extrinsic proof and not of judicial knowledge in our courts, to fix by law the amount which the treasurer of Alabama shall demand of appellants as a license tax to do an insurance business in this state. If the lawmaking power of that state should, in a day, modify, amend or repeal their revenue laws, *ipso facto,* such legislative action would modify, amend or repeal the legal operation of our laws, provided the principle contended for by appellant's counsel is a sound and prevailing one. This cannot be, for it would be confiding to a foreign jurisdiction that legislative discretion which the general assembly of Alabama are constitutionally bound to exercise themselves, and which they cannot delegate or commit to another. They are not permitted to 'substitute the judgment, wisdom and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust.'—Cooley's Const. Lim. 117. [Other citations.] If a law should be passed entitled 'an act to authorize the legislature of Mississippi to fix the amount of the license tax to be required of insurance companies, organized under the laws of that state and doing business in Alabama,' the objection would be obvious on first impression. Yet this is the necessary and practical effect of the statute as it now stands." (p. 220.)

In all the discussions of delegation of legislative power which have followed, nothing of consequence has been added to the opinions of Brewer and Somerville.

The defect in the reasoning of the Alabama court consisted in faulty analysis. The legislature of Alabama exercised its own judgment, determined the policy of that state, and made the law. The legislature of Mississippi might create conditions affecting application of the law. Whatever the conditions, the act of the legislature of Mississippi did nothing to the law of Alabama. The conditions were ascertainable with perfect certainty by the state administrative

officer of Alabama, the state treasurer. When the conditions were ascertained the law of Alabama governed the officer's conduct.

It is now settled beyond dispute by both state and federal decisions that the legislature may prescribe a rule to be applied according to existence or nonexistence of some fact which some officer or board is required to ascertain. (*Schaake v. Dolley*, 85 Kan. 598, 610, 613 (1911), 118 Pac. 80.) In the case of *State, ex rel., v. Smith*, 130 Kan. 228 (1930), 285 Pac. 542, the case of *Phoenix Ins. Co. v. Welch*, 29 Kan. 672, was cited and approved, and numerous subsequent decisions of this court, applying the doctrine of the Welch case, were collated.

A typical case involving delegation of legislative power is that of *State v. Crawford*, 104 Kan. 141, 177 Pac. 360. A statute provided that all electric wiring should be in accordance with the national electric code. It was represented to the court that the national electric code consisted of rules promulgated by some voluntary, unofficial associations, which were revised from time to time at meetings held now here and now there, and which covered the whole art of installing electric switchboards, poles, lines, inside and outside wiring of theaters and other buildings, and which specified suitable designs and material for electrical appliances. The statute made violation of the rules punishable as a misdemeanor. After citing cases holding it to be within the power of the legislature to punish violation of rules promulgated by some official body created by the legislature, the court, in the opinion by Dawson, J., said:

"But none of the cases cited has ventured so far afield as to intimate that the legislature might delegate to some unofficial organization of private persons, like the National Fire Protective Association, the power to promulgate rules for the government of the people of this state or for the management of their property, or that the legislature might prescribe punishment for breaches of these rules. We feel certain that no such judicial doctrine has ever been announced. If assent to such a doctrine could be given, a situation would arise where owners of property with considerable persistence might learn what these code rules were and incur the expense of making their property conform thereto, only to find that the National Fire Protective Association had reconvened in Chicago, New York, or New Orleans, and had revised the code, and that the work and expense had to be undertaken anew. And there would be no end of such a state of affairs." (p. 143.)

The court permitted briefs *amici curiae* to be filed in this case. In one of them the following from the opinion by Doster, C. J., in the case of *In re Hendricks*, 60 Kan. 796, 57 Pac. 965, is quoted as a clear and distinct statement of the law:

"Law is a rule of action, and it comes into being and goes out of being in obedience only to the legislative will, and during the time of its existence it is not the subject of experiment, of trying on and putting off. It is not a thing to be suspended, to be hung up for a day, the while something else is tried. It can be got rid of only by unconditional repeal." (p. 805.)

This statement was pertinent to the decision. It so happens, however, the statement did not occur in any discussion of the subject of delegation of legislative power, and the court disclaimed consideration of that subject as a basis of decision. The opinion reads:

"The writer, speaking for himself alone, is firmly of the opinion that the principle of direct legislation is the wiser and more democratic principle, and would like to see it incorporated into the political system of the country. He nevertheless joins with his associates in holding that the above-quoted act is inoperative and void. Our view, however, is not affected by the consideration that the enactment may be regarded as an application of the *referendum* principle, or as a delegation of legislative power, but by the fact that its principal provisions are so irreconcilable and absolutely contradictory of one another as to prevent the act from having any meaning or effect whatever." (p. 800.)

In this case the statute under consideration is a rule of action for municipalities desiring to issue revenue bonds. It came into being and it ceases to be effective only by the legislative will. During the entire time of its existence all of its provisions are, and will continue to be, just what they were the day the law was published in the official state paper. If the learned chief justice meant to say operation of a statute may not be suspended, and a law may not become wholly inoperative on the occurrence of some future event, except by unconditional repeal, he was in error. On the subject of suspension of operation of a general law see *Cunningham v. Reno County Comm'rs*, post, p. 267.

As indicated, the statute under consideration authorized bonds of a special kind. They were to be issued for a limited purpose—construction and improvement of revenue-producing utilities. The revenues were to be kept in a separate fund. The fund was to be devoted to payment of cost of operation and maintenance, to creation of a depreciation fund, and to payment of interest and principal of the bonds. The bonds were made a lien on revenues, but were not general obligations of the municipality, could not be paid from any other fund than revenue, and could not be paid from funds raised by taxation. They were bonds of an emergency type, just as the act of congress, with which the act of the legislature coördinated, was an emergency measure. But when the emergency ceased to

exist, no more bonds of that type were to be issued. Power of a municipality to issue such bonds was to cease when the national industrial recovery act expired. That was an event of which the courts would take judicial notice (*Helm v. Railway Co.*, 109 Kan. 48, 196 Pac. 426; 109 Kan. 57, 198 Pac. 190), and an event so notoriously affecting the economic and social interests of the state that all well-informed persons, including the governing bodies of municipalities, would know about it; and the contention that the legislature delegated to congress, or to the president, power to legislate for this state because they have power to create the condition on which the law shall cease to be effective, is tainted with the same fallacy which vitiated the Alabama decision, which was exposed in the opinion in the Welch case, and which has failed to prevail in all the decisions reviewed in the Smith case.

All the arguments with respect to delegating legislative power with respect to bringing an act into effective operation are marshalled in support of the proposition that the law delegated to congress and to the president power to repeal the act, repeal being admittedly as much a legislative function as enactment. The simple answer is, the legislature left nothing to the will or wisdom or patriotism of congress or the president with respect to how long revenue bonds might be issued by municipalities. It was the will and wisdom of the state legislature and of nobody else that when the federal law expired issuance of revenue bonds should cease.

In principle there is not the slightest difference between becoming effective and becoming ineffective on the happening of a contingency. In the opinion in the Welch case the decision in the case of *Home Ins. Co. v. Swigert*, 104 Ill. 653 (1882), was cited, with approval. A portion of the opinion in the Illinois case was quoted, and a portion of the first paragraph of the syllabus is pertinent here:

"While a law cannot have a mere fragmentary or inchoate existence, yet it is well settled that the operation and even remedial character of a perfect and complete law may, by virtue of limitations in the law itself, based upon contingent extrinsic matters, be enlarged, diminished, or wholly defeated."

The proceedings resulting in execution of the revenue bonds and their presentation for registration were instituted subsequent to June 16, 1935. It is contended the legislature must have contemplated the revenue bond act would become ineffective at least by June 16, 1935, and possibly sooner, and so limited duration of the act to not later than June 16, 1935. It would have been easy for the legislature to say that, but it did not do so.

The revenue bond act and a number of other acts of the special session of 1933 (chs. 8, 12, 43, 110, 125) were framed in coöperation with title II of the national industrial recovery act, relating to public works and construction projects. The legislature was concerned with title II only. The provision of that title relating to prospective duration has been quoted.

The legislature of this state was not so sanguine as congress about finality of the national industrial recovery act as a means of ending economic depression, either as to content or duration. Section 11 of the statute under consideration took into account possible amendment of the federal statute. Chapter 95 of the Laws of 1933, Special Session, reads in part:

"Section 1. The limitation of the amount of high-type pavement which may be constructed in any one year by the state highway commission, as provided in chapter 241 of the Session Laws of 1933, shall not apply to pavement constructed from funds received from the federal government under the provisions of the national industrial recovery act or any additions or amendment thereto. . . ."

Chapter 33 of the same laws, relating to construction, repair and extension of public improvements by municipalities, begins as follows:

"Section 1. In order to coöperate with the federal government under the national industrial recovery act and during the time said act is in effect, the governing body or the proper officers of any municipality. . . ."

Reading section 11 with these cognate statutes, it is plain the legislature did not contemplate the coming to an end of the national industrial recovery act on any definite date, and intended to extend the benefit of chapter 32 to expiration of the federal act, whenever that might occur.

The matter of amendment of the national industrial recovery act was alluded to in section 11 only as affecting expiration of the federal law, and an argument that this somehow constituted delegation of power to legislate is answered by what has been said on that subject.

It is contended title II of the national industrial recovery act did expire on June 16, 1935. Neither congress nor the president so understands, and this court has reason to know the title is still operative in fact in this state. Methods of legislation by congress are not so limited as methods of legislation by the legislature of this state, and the meticulous arguments in favor of the contention will not be detailed. The question here is whether, within the meaning of

section 11 of the state law, title II of the congressional act has expired. For present purposes it will be assumed the title is still operative, by virtue of section 12 of the emergency relief appropriation act of congress of April 8, 1935, which reads in part:

"Sec. 12. The Federal Emergency Administration of Public Works established under title II of the National Industrial Recovery Act is hereby continued until June 30, 1937, and is authorized to perform such of its functions under said act and such functions under this joint resolution as may be authorized by the president. All sums appropriated to carry out the purposes of said act shall be available until June 30, 1937."

In discussing the subject of extension of time for expiration of title II of the federal act, the contentions relating to delegation by the legislature of this state of its lawmaking power to congress and to the president of the United States are renewed with great vigor.

A writ of mandamus, requiring the auditor to register the Pittsburg bonds, was allowed on December 14, 1935. The foregoing gives the court's views respecting the auditor's objections to registering the bonds.