# JENKINS v. COLLARD.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 316. Submitted April 18, 1892. — Decided May 16, 1892.

Although, under the ruling in *Wallach* v. *Van Ryswick*, 92 U. S. 207, the defendant in a proceeding for confiscation under the confiscation act of July 17, 1862, 12 Stat. 589, c. 195, and Joint Resolution No. 63, of the same date, 12 Stat. 627, had no power of alienating the reversion or

remainder which was still in him after confiscation and sale, still an alienation of it by him by a deed of warranty, accompanied by a. covenant of seizin on his part, estopped him and all persons claiming under him from asserting title to the premises against the grantee, his heirs and assigns, or from conveying it to any other parties.

The general pardon and amnesty made by the public proclamation of the President at the close of the war of the rebellion had the force of public law.

The court stated the case as follows:

This is an action of ejectment brought by the plaintiffs to recover of the defendant two lots of land in the city of Cincinnati, Ohio, with the buildings thereon, known as Nos. 50 and 52 West Pearl Street in that city. The plaintiffs below, who are also plaintiffs in error here, are the children and only heirs of Thomas J. Jenkins, deceased. They are residents and citizens of West Virginia. Two of them, Albert Gallatin Jenkins and George R. Jenkins, are minors under the age of twenty-one years, and appear by their mother and guardian. The defendant is a citizen of Ohio and a resident of Cincinnati.

The petition, the designation given to the first pleading in the case, alleges that prior to 1863 Thomas J. Jenkins was the owner of the real estate mentioned, which is fully described, and that while such owner he joined the rebel army, and such proceedings were had in the District Court of the United States for the Southern District of Ohio in the year 1863; that the property was confiscated, and the life estate of Jenkins was sold, and the defendant William A. Collard, then or subsequently in the year 1865, and during the lifetime of Jenkins, became the owner of the life estate; that Jenkins died on the 1st day of August, 1872; and that thereupon the plaintiffs became seized of the legal estate in the premises and entitled to the possession thereof; but that the defendant since that time has unlawfully kept them out of possession. The petition also sets forth that the defendant has been receiving the rents, issues and profits of the premises from the first day of August, 1872, up to the commencement of this action without the consent of the plaintiffs, and has refused to account for them; that their yearly value has been, on the average, eighteen hun-

dred dollars; and that the plaintiffs have been deprived of all profit and benefit from the premises since that time, to their damage of forty thousand dollars. They therefore pray judgment for the possession of the premises and for the damages alleged.

The defendant appeared to the action and set up nine defences. The first defence, which was substantially the general issue, was subsequently withdrawn. To the several other defences demurrers were interposed and all of them, except the one to the second defence, were sustained, and no further proceeding respecting them was taken. The second defence was as follows:

"For a second defence the defendant says that he denies that such proceedings were had in the District Court of the United States within and for the Southern District of Ohio, in the year 1863, or at any other time, that the said property was confiscated, but defendant avers that in a proceeding instituted in said court in the year 1863, a decree was entered in the words and figures following, to wit:

"'District Court United States, Southern District of Ohio.

"'The United States

*vs.*

"'Lots and Stores Nos. 50 and 52, Pearl Street, Cincinnati.

"'This cause came on for hearing at this term, upon the libel of information filed herein, and upon the evidence in the case, and the court find that, in pursuance of law, the attorney of the United States for the Southern District of Ohio did issue to the marshal of said district his warrant in writing bearing date March 9th, 1863, commanding him to seize for the cause set forth in said warrant all the right, title, and interest of one Thomas J. Jenkins, in and to the real estate described in said warrant, and in said libel of information, and that in pursuance thereof the said marshal, on the 12th day of March, 1863, seized said real estate and notified the tenants thereof, and also W. A. Collard, agent of said Jenkins, of such seizure by notice in writing. That afterwards, on the 7th day of March, 1863, a writ of monition issued out of this court,

under the laws thereof, to said marshal, by virtue whereof the usual notice prescribed by law and by the rules of this court to all persons interested in said real estate to appear in this court on the first Tuesday of April, 1863, to assert their claims, if any they have, in said real estate, was given by said marshal, which notice was duly published in the Cincinnati Daily Gazette, a newspaper printed and of general circulation in said district, for ten days from and after March 18, 1863, and all persons interested having made default, and the default of all persons being duly entered, and the court having heard the testimony of the witnesses proving that said Thomas J. Jenkins, of the State of Virginia, at the date of said seizure, was the owner of said property, and that ever since the 17th day of July, 1862, the said Thomas J. Jenkins was, and now is, in the army service of the rebels in arms against the United States, to wit, in the State of Virginia; and the court further find that the allegations in said libel are true in fact, and that the life estate of said Jenkins in said real estate is justly and legally forfeited to the United States in pursuance of law, for the causes set forth in said libel.

" ' It is further ordered, sentenced and decreed that the life estate of said Thomas J. Jenkins be, and the same is, hereby condemned as enemies' property, and that the same be appraised, advertised and sold in the manner pointed out by the rules of this court, and to that end the necessary process is ordered to be issued to the marshal to make sale of said real estate in the manner aforesaid, and that upon such sale he bring the proceeds into this court for distribution; and it is further ordered that the rights of all loyal people to share in such distribution are hereby reserved for further hearing.'

" Defendant says that the above was the only decree touching said property, except the decree of confirmation of the sale and distribution of proceeds.

" Defendant says that thereafter such proceedings were had in said cause that there was sold and conveyed by the marshal, in accordance with said decree, the life estate of said Thomas J. Jenkins to one Edward Bepler.

" Defendant says that by reason of the premises all the

estate of said Jenkins in said property was not condemned and sold, but that there remained in him the reversion or remainder in fee of said property after said life estate sold to said Bepler. Defendant further says that after the termination of the civil war said Thomas J. Jenkins bargained and sold to the defendant, in consideration of the sum of eighteen thousand dollars paid to said Jenkins by defendant, all the interest and estate of said Jenkins in said property, and did execute and deliver to the defendant, on the 26th day of August, 1865, a deed in fee simple, with covenants of general warranty, binding himself and his heirs, and Susan L. Jenkins, wife of said Thomas J. Jenkins, did join in said deed and did release all her right and expectancy of dower in said property.

" Defendant further says that on the 6th day of June, 1865, said Edward Bepler did execute and deliver to the defendant a deed for said life estate purchased by him at said sale. Defendant says that by reason of the premises he became the owner in fee simple of the property and entered into possession thereof and so continued to the present time."

To this defence the plaintiffs demurred on the ground that it constituted no defence and was insufficient in law on its face ; and they claimed and asked the court to hold that by the decree set up there was an adjudicated forfeiture and sale of the lots described under the confiscation act of Congress of July 17, 1862, 12 Stat. 589, c. 195, and the joint resolution of even date therewith, 12 Stat. 627, and that there was not left in Thomas J. Jenkins any interest which he could convey by deed, but that all which could become the property of the United States and could be sold by virtue of a decree of condemnation and order of sale was the life estate of Thomas J. Jenkins, and that a decree condemning the fee could have no greater effect than to subject the life estate to sale, and therefore the deed executed and delivered by him on the 26th day of August, 1865, was a nullity, and the plaintiffs inherited and were entitled to the property as prayed for in their petition. But the court held that by reason of said decree all the estate of Thomas J. Jenkins in the property was not condemned and

sold, but only a technical life estate therein, and that there remained in him the reversion or remainder in fee of the property after the termination of the life estate sold to said Bepler, which he could sell and convey by deed, and which he did sell and convey by the deed of August 26th, 1865, and that consequently the plaintiffs' had not inherited any interest in the property, and overruled the demurrer; to which the plaintiffs excepted. The plaintiffs then had leave to reply to the defence, and they replied as follows: "That by the proceedings in the District Court of the United States for the Southern District of Ohio, in the year 1863, all the estate of Thomas J. Jenkins in the property was confiscated and sold, and there did not remain in him the reversion or remainder in fee after the sale to Bepler; that they admit the execution and delivery of a deed to the defendant on the 26th day of August, 1865, by Thomas J. Jenkins, at Cincinnati, in the State of Ohio, but deny that Jenkins had any interest in the property at that time which he could convey, and aver that defendant took nothing by the deed from him." To which reply the defendant demurred, and, after hearing the case, the Circuit Court of the United States for the Southern District of Ohio, at October term, 1888, held that only the technical life estate of Thomas J. Jenkins was confiscated by the said decree, and that there was left in him the reversion or remainder, which he sold and conveyed to the defendant by the deed of August 26, 1865, and that consequently the plaintiffs had no interest in the property, and sustained the demurrer; to which ruling the plaintiffs excepted. And the plaintiffs not desiring to plead further, the court gave judgment for the defendant for the reasons stated in overruling the demurrer.

To review that judgment the case is brought to this court on writ of error.


*Mr. S. A. Miller* for plaintiffs in error.


*Mr. J. D. Brannan* and *Mr. John C. Healy* for defendant in error.

MR. JUSTICE FIELD, after stating the case, delivered the opinion of the court.

The important questions presented in this case relate to the nature and duration of the estate condemned and sold by the decree of the United States District Court for the Southern District of Ohio in the proceedings taken for the confiscation of the property of Thomas J. Jenkins, under the act of Congress of July 17, 1862, 12 Stat. 589, and to the power of disposition possessed by him over the naked fee or property in reversion, after the termination of the confiscated estate. The questions must find their solution in the interpretation given to the provisions of that act and to the terms of the decree. The act is entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels and for other purposes."

In one of the earlier cases in this court under this act, it was earnestly contended that the act was not passed in the exercise of the war powers of the government, but in the execution of the municipal power of the government to legislate for the punishment of offences against the United States. Such was the contention in *Miller* v. *United States*, 11 Wall. 268, 308, 369. The court, however, was of opinion that only the first four sections, which were aimed at individual offenders, were open to that objection; and admitted that they were passed in the exercise of the sovereign, and not the belligerent, rights of the government; but held that in the 5th and following sections another purpose was avowed, not that of punishing treason and rebellion, as described in the title, but the other purpose there described, that of seizing and confiscating the property of rebels. The language of the 5th section is that "to insure the speedy termination of the present rebellion it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, credits and effects of the persons hereinafter named in this section, and to apply and use the same, and the proceeds thereof, for the support of the army of the United States." And the court, stating that the avowed purpose of the act was not to reach any criminal

personally, but to insure the speedy termination of the rebellion, which the court had recognized as a civil war, held that this purpose was such as Congress in the situation of the country might constitutionally entertain, and that the provisions made to carry it out, namely, confiscation, were legitimate, unless applied to others than enemies. The act, therefore, in execution of this purpose, provided for judicial proceedings *in rem,* for the condemnation and sale of the property mentioned, after its seizure, to be brought in any District or Territorial Court of the United States, which should conform as nearly as possible to proceedings in admiralty and revenue cases; and it declared that if the property should be found to have belonged to a person engaged in rebellion, or who had given aid or comfort thereto, the same should be condemned as enemies' property, and become the property of the United States, and might be disposed of as the court should decree, and the proceeds thereof paid into the Treasury of the United States for the purposes stated. After the act embodying this and other provisions had passed both houses of Congress and been presented to President Lincoln for approval, it was ascertained that he was of opinion that in some of its features it was unconstitutional, and that he intended to veto it. His objections were that in several of its clauses the provision of the Constitution concerning forfeitures not extending beyond the life of the offender was disregarded. Art. III, sec. 3. To meet this objection, which had been communicated to members of the House of Representatives, where the bill originated, a joint resolution, explanatory, as it was termed, of the act — but which might more properly be designated amendatory of the act and restrictive of its operation — was passed by the House and sent to the Senate. That body, being informed of the objections of the President, concurred in the joint resolution. It was then sent to the President, and was received by him before the expiration of the ten days allowed him for the consideration of the original bill. He returned the bill and resolution together to the house where they originated, with a message, in which he stated that, considering the act and the resolution explanatory of the act as being substantially one, he approved and signed both. 12 Stat. 589 and 627.

The joint resolution declares that the provisions of the third clause of the 5th section of the act shall be so construed as not to apply to any act or acts done prior to its passage, " nor shall any punishment or proceedings under said act be so construed as to work a forfeiture of the real estate of the offender beyond his natural life." No decree condemning real property of persons seized under the act, could therefore extend the forfeiture adjudged beyond the life of the offending owner. During his life only could the control, possession, and enjoyment of the real property seized and condemned be. appropriated. To that extent the property vested in the United States upon its condemnation and passed to the purchaser to whom the government might afterwards sell it.

What then was the situation of the remainder of the estate of the offending party after the condemnation and sale ? The proceedings did not purport to touch any interest in the property or control of it beyond his life. When that ceased, his heirs took the property from him. They could not take anything from the government, for it had nothing; the interest it acquired by the condemnation passed by the sale to the purchaser. The reversionary interest or remainder of the estate must have rested somewhere. It could not have been floating in space without relationship to any one. The logical conclusion would seem to be that it continued in the offending owner. This, we think, follows, not only from the language of the act, but from decisions of this court construing its provisions, though some of the latter contain declarations that its possession is unaccompanied with any power of disposition over the future estate during his life.

In *Bigelow* v. *Forrest*, 9 Wall. 339, which came before this court at December term, 1869, it was held that the act of July 17, 1862, and the explanatory resolution of the same date, were to be construed together, and that thus construed all that could be sold by virtue of a decree of condemnation and order of sale under the act was a right to the property seized terminating with the life of the offending person, and that the fact that he owned the estate in fee simple, that the libel was against all his right, title, interest and estate, and

that the sale and marshal's deed professed to convey as much, did not change the result. The District Court, said this court, under the act of Congress, had no power to order a sale which would confer upon the purchaser rights outlasting the life of the party, and had it done so it would have transcended its jurisdiction. This was the unanimous decision of the court.

In *Day* v. *Micou*, 18 Wall. 156, before this court at October term, 1873, it was held also by the court unanimously that, under the confiscation act and joint resolution explanatory of it, only the life estate of the person for whose offence the land had been seized was subject to condemnation and sale, and that the fact that the decree may have condemned the fee did not alter the case. ·

In *Wallach* v. *Van Riswick*, 92 U. S. 202, 207, which was before this court at October term, 1875, it was held that after an adjudicated forfeiture and sale of an enemy's land under the confiscation act, and the joint resolution accompanying it, there was not left in him any interest which he could convey by deed. This ruling was not made upon any express provision of the statute. There is no personal disability imposed by its provisions upon the offending party beyond the forfeiture of his estate during his life. It was made by the court, apparently upon what it considered the policy of the confiscation act. The purpose of the act, it said, and its justification, was to strengthen the government, and to enfeeble the public enemy by taking from his adherents the power to use their property in aid of the hostile cause. "With such a purpose," it added, "it is incredible that Congress, while providing for confiscation of enemy's land, intended to leave in that enemy a vested interest therein, which he might sell and with the proceeds of which he might aid in carrying on the war against the government." In this ruling, the court, in addition to the statutory effect of the decree as a conveyance to the United States of the title to the land for the life of the offending party, made the decree impose upon him a disability or disqualification to hold or transfer an estate which the United States did not acquire or condemn.

Though the ruling in *Wallach* v. *Van Riswick* was followed ·

in several cases — in *Pike* v. *Wassell*, in 1876, 94 U. S. 711, and in *French* v. *Wade*, in 1880, 102 U. S. 132 — this court subsequently held, in 1884, in *Avegno* v. *Schmidt*, 113 U. S. 293, that the heirs at law of a person, whose life interest in real estate was confiscated under the confiscation act of July 17, 1862, took at his death by descent from him and not from the United States under the act, and, in 1887, in *Shields* v. *Schiff*, 124 U. S. 351, 355, that the confiscation act of July 17, 1862, construed in connection with the joint resolution of the same date, made no disposition of the confiscated property after the death of the owner, but left it to devolve upon his heirs, and not by donation from the government.

It is not to be overlooked that previous to the decision of the case of *Wallach* v. *Van Riswick* a general amnesty and pardon had been proclaimed by the President throughout the land to all who had participated in the rebellion, thus relieving them from the disabilities arising from such participation. Estates and interests in land, present and future, which had not for such participation been previously condemned and sold to others, fell at once under the control and disposition of the original owners, as though the offences alleged against them had never been committed. The pardon and amnesty did not and could not change the actual fact of previous disloyalty, if it existed, but, as said in *Carlisle* v. *United States*, 16 Wall. 147, 151, " they forever closed the eyes of the court to the perception of that fact as an element in its judgment, no rights of third parties having intervened." As repeatedly affirmed by this court, pardon and amnesty in legal contemplation not merely release offenders from the punishment prescribed for their offences, but obliterate the offences themselves.

In *Illinois Central Railroad Co.* v. *Bosworth*, 133 U. S. 92, 100, 102, 104, 105, which was here at October term, 1889, we have the latest expression of this court upon the subject we have been considering, and also on the effect of pardon and amnesty upon the disabilities imposed upon parties whose life estates had been confiscated under the act of July 17, 1862, and the accompanying joint resolution. That was an action brought by the surviving children of A. W. Bosworth, deceased, to recover pos-

session of one undivided sixth part of a tract of land in New Orleans, which formerly belonged to their father. The petition stated that the latter, having taken part in the war of the rebellion, and done acts which made him liable to the penalties of the confiscation act, the said one-sixth part of the land was seized, condemned and sold, under the act, and purchased by one Burbank, in May, 1865; that A. W. Bosworth died in October, 1885; and that the plaintiffs, upon his death, became the owners in fee simple of the said one-sixth part of the property of which the defendant, the Illinois Central Railroad Company, was in possession. The company filed an answer setting up various defences, among others, tracing title to themselves from Bosworth, by virtue of an act of sale executed by him and wife in September, 1871, disposing of all their interest in the premises with full covenants of warranty. They also alleged that Bosworth had, before the act of sale, not only been included in the general amnesty proclamation of the President, issued on the 25th of December, 1868, but had received from him a special pardon on the 2d of October, 1865, and had taken the oath of allegiance and complied with the terms and conditions necessary to be restored to, and reinvested with, the rights, franchises and privileges of citizenship.

The principal question involved in the case was whether, by the effect of the pardon and amnesty granted to A. W. Bosworth, he was restored to the control and power of disposition over the fee simple or naked property in reversion, expectant upon the determination of the confiscated estate in the property in dispute. "The question of the effect of pardon and amnesty," said the court, "on the destination of the remaining estate of the offender, still outstanding after a confiscation of the property during his natural life, has never been settled by this court." In *Wallach* v. *Van Riswick,* the court said it " was not called upon to determine where the fee dwells during the continuance of the interest of a purchaser at a confiscation sale, whether in the United States, or in the purchaser subject to be defeated by the death of the offender." It had been also suggested that the fee remained in the person whose estate was confiscated, but without any power in him to dis-

pose of or control it. "Perhaps," said Mr. Justice Bradley, in speaking for the court, and referring to those different suggestions, "it is not of much consequence which of these theories, if either of them, is the true one; the important point being that the remnant of the estate, whatever its nature, and wherever it went, was never beneficially disposed of, but remained, so to speak, in a state of suspended animation." And again he said, "it is not necessary to be over-curious about the intermediate state in which the disembodied shade of naked ownership may have wandered during the period of its ambiguous existence. It is enough to know that it was neither annihilated, nor confiscated, nor appropriated to any third party. The owner, as a punishment for his offences, was disabled from exercising any acts of ownership over it, and no power to exercise such acts was given to any other person. At his death, if not before, the period of suspension comes to an end, and the estate revives and devolves to his heirs at law." "It would seem to follow," added the learned justice, "as a logical consequence from the decisions in *Avegno* v. *Schmidt* and *Shields* v. *Schiff*, that after the confiscation of the property the naked fee (or the naked ownership, as denominated in the civil law) subject, for the lifetime of the offender to the interest or usufruct of the purchaser at the confiscation sale, remained in the offender himself; otherwise, how could his heirs take it from him by inheritance? But, by reason of his disability to dispose of, or touch it, or affect it in any manner whatsoever, it remained, as before stated, a mere dead estate, or in a condition of suspended animation. We think that this is, on the whole, the most reasonable view. There is no corruption of blood; the offender can transmit by descent; his heirs take from him by descent; why, then, is it not most rational to conclude that the dormant and suspended fee has continued in him?" And the court held after full consideration that the disabilities which prevented the offending party — Bosworth — from exercising power over the suspended fee, or naked property, was removed by the pardon and amnesty, and that he was restored to all his rights, privileges and immunities, as if he had never offended, except as to

those things which had become vested in other persons; and that, among other things, "he was restored to the control of so much of his property and estate as had not become vested either in the government or in any other person; especially that part or quality of his estate which had never been forfeited, namely, the naked residuary ownership of the property, subject to the usufruct of the purchaser under the confiscation proceedings."

In the confiscation proceedings, under which the property in controversy was condemned and sold, the decree of the United States District Court adjudged, from the proof presented, that Thomas J. Jenkins, the party whose property was proceeded against, was, at the date of its seizure, the owner of the property, which consisted of certain real estate described, and had been since July 17, 1862, and was in the service of the rebels, in arms against the United States, and *that his life estate in the said real estate* was justly and legally forfeited, and it ordered *that such life estate* be condemned and sold, and that the necessary process be issued to the marshal to make such sale and bring the proceeds into court. Upon this decree a sale and conveyance were made by the marshal *of the life estate of said Jenkins* to one Edward Bepler. The only sale and conveyance executed under the decree as thus seen, were of the life estate of Thomas J. Jenkins in the real property in controversy. No condemnation was had or sale made of any other estate in the premises.

In some of the cases, as, for instance, *Bigelow* v. *Forrest*, 9 Wall. 339, a condemnation and sale had been made of the property in fee, and it was held to be valid as a condemnation and sale of the life estate of the offending owner; but the reverse is not true. When the lesser estate—the life estate— is sold, the sale cannot be held to pass the larger estate — the fee.

Of the reversion or remainder of the estate of the offending party no disposition was ever made by the government. It must, therefore, be construed to have remained in him, but, under the ruling in *Wallach* v. *Van Riswick*, without any power in him to alienate it during his life. That disability

was in force when he executed, with his wife, the deed of the premises, August 26, 1865. The proclamation of pardon and amnesty was not made by the President until December 25, 1868. This deed, however, was accompanied with a covenant of seizin on his part, and that he would warrant and defend the title against the lawful claims of all persons whomsoever. Admitting that he had no present estate in the premises, and none in expectancy, he was at liberty to add to his deed the ordinary covenants of seizin and warranty, and the same legal operation upon future acquired interests must be given to them as when accompanying conveyances of parties whose property has never been subject to confiscation proceedings. That warranty estopped him and all persons claiming under him from asserting title to the premises against the grantee and his heirs and assigns, or conveying it to any other parties. When, subsequently, the general amnesty and pardon proclamation was issued, the disability, if any, that had previously rested upon him against disposing of the remaining estate, which had not been confiscated, was removed, and he stood, with reference to that estate, precisely as though no confiscation proceedings had ever been had. The amnesty and pardon in removing the disability, if any, resting upon him, respecting that estate, enlarged his estate, the benefit of which enured equally to his grantee. The removal of his disabilities did not affect the purchaser's right under the decree of confiscation. The latter remained in the full enjoyment of the property during the life of the offending party, but he had no claim upon the future estate, nor did the heirs of the offending party have any such claim upon it as to preclude the operation of any previous warranties by him respecting it. *Van Rensselaer* v. *Kearney,* 11 How. 297; *Irvine* v. *Irvine,* 9 Wall. 617. As the general pardon and amnesty to all persons implicated in the rebellion are not pleaded by the defendant, to relieve the offending party, whose life estate in the premises in controversy was confiscated, from his disabilities respecting the reversionary interest, or naked fee in the premises, it is claimed that no benefit can be derived from them. But this result does not follow from the omission in pleading, for the pardon and amnesty were

made by a public proclamation of the President, which has the force of public law, and of which all courts and officers must take notice, whether especially called to their attention or not. *Jones* v. *United States,* 137 U. S. 202, 212, 215.

*Judgment affirmed.*