### In re MILLER, Alien Property Custodian

(Circuit Court of Appeals, Second Circuit. April 17, 1922.)

No. 130.

**1. War ⬅⬅12—Congress may authorize the government to take possession of property of alien enemies.**

Congress has the power to authorize the government to take possession of the property of alien enemies.

**2. War ⬅⬅12—Power to authorize confiscation of enemy property vested in Congress.**

Under Const. art. 1, § 8, cl. 11, the sole power of authorizing confiscation of enemy property is vested in Congress.

**3. War ⬅⬅12—President need not personally determine property owned by alien enemy.**

Under Trading with the Enemy Act, § 7c (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d), providing for the seizing of property of alien enemies, "which the President after investigation shall determine is so owing or so belongs or is so held," the determination by the President was not necessarily a personal determination by him, since he could act through the Alien Property Custodian appointed by him.

**4. War ⬅⬅12—Trustees of property of alien enemies not entitled to a judicial hearing before the Alien Property Custodian.**

Trustees of property belonging to alien enemy were not entitled to a judicial hearing before the Alien Property Custodian, before the latter has a right to the possession of the property, and where trustees refused to comply, and the Custodian availed himself of the remedy given by Trading with the Enemy Act, § 17 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½i), and asked the court for an order to compel the trustees to comply forthwith, it was immaterial that one of three trustees had not been personally served with the order, or with a copy of the petition by which the proceeding was instituted, especially where the will under which the trustees held provided that the majority of the trustees had power to act.

**5. War ⬅⬅12—Trading with the Enemy Act held to provide for seizure of trust estates.**

Act Oct. 6, 1917, § 7c, particularly as amended by Act Nov. 4, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d), provided for the seizure by the Alien Property Custodian not merely of legal estates, but of trust estates as well; it being immaterial whether the legal title was in the enemy owner or was held by another for his benefit.

**6. War ⬅⬅12—Interests of third persons in property of enemy aliens not determined in proceeding by Alien Property Custodian to obtain possession.**

Any and all questions concerning any interests claimed by third persons in property seized or demanded by the Alien Property Custodian were to be raised and determined as provided by Trading with the Enemy Act, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), and not in a proceeding under section 17 (section 3115½i) by the Alien Property Custodian to gain possession of the property.

**7. War ⬅⬅12—Demands of Alien Property Custodian effected immediate seizure.**

Demands by the Alien Property Custodian for the surrendering of property of enemy aliens effected an immediate seizure of the property demanded under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), and a proceeding by the Alien Property Custodian under section 17 (section 3115½i), after a failure to comply with the demands, was not a proceeding to make a seizure of the property, but only one to enforce a seizure already made.

---

⬅⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. **War ⬅33—Alien Property Custodian could seize property after Armistice was entered into.**

The Alien Property Custodian had the right to seize property of enemy aliens after the Armistice of November 11, 1918, was entered into, and before July 2, 1921, when the war was declared at end by the joint resolution of Congress, approved and signed by the President.

9. **War ⬅33—Demand of Alien Property Custodian before end of war enforceable subsequent to war.**

Where the Alien Property Custodian, before the war was formally ended by resolution of Congress on July 2, 1921, demanded the surrender of property of enemy aliens under the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.), his right to possession of the property demanded was enforceable after such date.

10. **War ⬅12—President could grant application for return of property to enemy alien.**

Where a female at the time of her marriage was a citizen of the United States, and intermarried with a citizen of Germany prior to April 6, 1917, and property seized by the Alien Property Custodian was not acquired by her from a subject of Germany, but from her father, who was a citizen of the United States, the President had the right to grant an application by her for the return of the property under the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.).

11. **Appeal and error ⬅1108—Circuit Court of Appeals has power to modify order with consent of parties.**

Where conditions have changed pending an appeal from an order of the federal District Court, the Circuit Court of Appeals, with the consent of the parties, has the authority to modify the order.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the application of Thomas W. Miller, as Alien Property Custodian of the United States, for an order directing Eugene Schaefer and another, as trustees under the last will and testament of Dr. Louis Schaefer, deceased, to deliver to the said Alien Property Custodian the property in their hands as trustees for the benefit of Helene Kyriss and Amalia Janner and remaindermen. From an order directing them to pay over the property involved, the trustees appeal. Affirmed as to Amalia Janner, and reversed, with directions to dismiss, as to Helene Kyriss.

E. Henry Lacombe, James O. Tryon, and Henry Bennett Leary, all of New York City, for appellants.

William Hayward, U. S. Atty., of New York City (Mansfield Ferry, of New York City, of counsel), for Alien Property Custodian.

Selden Bacon, of New York City, amicus curiæ.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge. This is an appeal from an order made by the District Court for the Southern District of New York, on the petition of the Alien Property Custodian of the United States, who is hereinafter called the Custodian. The order, which was entered on August 3, 1921, directed the three trustees under the will of Dr. Louis Schaefer, a deceased citizen of the United States and a resident of the city of New York, to pay over to the Custodian a certain income, which, it is

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

admitted, had arisen from trusts created by the testator for the benefit of his daughters Amalia Schaefer Janner and Helene Schaefer Kyriss, respectively; they being alien enemies.

The testator died in New York City on November 26, 1921, leaving a will creating certain trusts and naming three trustees—his brother Eugene Schaefer, also appointed executor, his son Ludwig Schaefer, and Edwin W. Preston. Certain provisions in the will relating to the trust may be found in the margin.[1]

The Act of Congress approved October 6, 1917, and entitled "An act to define, regulate, and punish trading with the enemy, and for other purposes," by section 6, authorized the President to appoint and prescribe the duties of an official to be known as the Alien Property Custodian, "who shall be empowered to receive all money and property in the United States due or belonging to an enemy, or ally of enemy, which may be paid, conveyed, transferred, assigned, or delivered to said custodian under the provisions of this act." 40 Stat. pt. 1, c. 106, p. 415 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½cc). The act provides for the transfer or delivery of property held for or on account of an alien enemy to the Custodian, if the President shall so require. And by an act approved on November 4, 1918, the act of 1917 was amended, and express provision was made giving to the Custodian the right to *seize* property which the President has determined belongs to an alien enemy and has required to be paid over. 40 Stat. pt. 1, c. 201, p. 1020 (Comp. St. Ann. Supp. 1919, § 3115½d).

[1] "(3) To divide all my said property and estate, including the remainder in the trust funds to be created for the benefit of my wife, Olga Schaefer, or Frau Johannes Taaks, as hereinabove set forth, into four equal parts or shares, as nearly as the same can be divided and as shall appear to my said trustees most judicious, according to the situation and circumstances of my property and estate; to keep the shares so set apart invested in such property and securities as I may leave at the time of my death, or to reinvest the same as hereinafter provided; to pay the income from one of said equal parts or shares of my said estate, after deducting the necessary and proper expenses of administration, to be apportioned equally on each share, to my daughter, Amalia Janner, now the wife of Fritz Janner, residing at Amberg, in Bavaria, Germany, for her own use, during her life; to pay the income from another equal part or share of my estate to my daughter, Helen Schaefer, for her own use during her life; to pay the income from another equal part or share of my said estate to my daughter, Bertha Schaefer, for her own use during her life; to pay the income from another equal part or share of my said estate to my son Ludwig Schaefer, for his own use during his life.

"(4) On the thirty first day of December, one thousand nine hundred and twenty-one, I order and direct my said trustees to convey, transfer and set over to each of my said children, Amalia Janner, Helen Schaefer, Bertha Schaefer and Ludwig Schaefer, respectively, for their own use, and without any further restrictions, forever, one-half of the part or share of my said estate so set apart for each of them, the other one-half of the share or part of my estate thus set apart for each of my said children, Amalia Janner, Helen Schaefer, Bertha Schaefer and Ludwig Schaefer, my trustees shall continue to hold, paying over the income as hereinbefore directed to each of my said children until the thirty-first day of December, one thousand nine hundred and thirty-one, and on said day, I order and direct my said trustees to convey, transfer and set over to each of my said children, Amalia Janner, Helen Schaefer, Bertha Schaefer and Ludwig Schaefer, respectively, the remaining one-half of the part or share of my said estate thus set apart for each of them for their own use and without further restrictions whatever."

The right of the Custodian to the property of an alien enemy and to the aid of the court in securing its possession is directly involved herein, and as we proceed in the consideration of this appeal we shall have occasion to examine more in detail the acts of Congress which bear upon the subject involved. It appears that the Custodian filed a petition in the District Court for the Southern District of New York in which he made application for an order directing the trustees under the Schaefer will to deliver to him as Custodian balances of $36,129.-89 upon the Helen Kyriss trust fund and of $35,450.54 upon the Amalia Janner trust fund, and he prayed that the trustees be ordered to appear and show cause why the property, which had been previously demanded of them by him, had not been delivered and why it should not be delivered to him and for such other and further relief as the court deemed just.

The order to show cause, dated June 28, 1921, was issued and directed to be served upon the three trustees. It was served upon two only, Eugene Schaefer and Edwin W. Preston. The third trustee, Dr. Ludwig Schaefer, was not served, being without the United States and within the republic of Switzerland temporarily at the time these proceedings were had. Two of the three, Eugene Schaefer and Edwin W. Preston, appeared and made return to the petition. They demurred, and also put in a traverse and answer. When the case came on to be heard upon petition, answer, and proof of service upon the two trustees, and after argument, the District Court entered an order requiring the three trustees forthwith to pay over to the Custodian the property as demanded. This order, which is the one appealed from, may be found in the margin.[2]

[1] The question of the constitutionality of the various acts of Congress authorizing the government to take possession of the property of alien enemies which are involved in this case is not raised by counsel. The right of Congress to pass this legislation seems to be now too clearly established to admit of question. Stoehr v. Wallace, 255 U.

[2] "Ordered, adjudged, and decreed as follows, viz.: That Eugene Schaefer, Dr. Ludwig Schaefer, and Edwin W. Preston, as trustees under the last will and testament of Dr. Louis Schaefer, deceased, shall forthwith pay over to Thomas W. Miller, as Alien Property Custodian thirty-three thousand, one hundred fifty-six and 57/100 dollars ($33,156.57), on account of income earned subsequent to June 21, 1919, by the trust fund created by the said will of Dr. Louis Schaefer, deceased, for the benefit of Helene Kyriss, being the net receipts of $36,129.89, set forth in the petition, less deductions of $796.74 for trustees' commissions, and $2,176.58 for federal income tax paid by the trustees upon the said income accruing to the trust created for the benefit of Helene Kyriss; and it is

"Further ordered, adjudged, and decreed that Eugene Schaefer, Dr. Ludwig Schaefer, and Edwin W. Preston, as trustees under the last will and testament of Dr. Louis Schaefer, deceased, shall forthwith pay over to Thomas W. Miller, as Alien Property Custodian, thirty-two thousand seven hundred ninety-nine and 26/100 dollars ($32,799.26), on account of income earned subsequent to June 21, 1919, by the trust fund created by said will of Dr. Louis Schaefer, deceased, for the benefit of Amalia Janner, being the net receipts of $35,450.54, set forth in the petition, less deductions of $797.91 for trustees' commissions, and $1,853.37, for federal income tax paid by the trustees upon the said income accruing to the trust created for the benefit of Amalia Janner."

S. 239, 245, 41 Sup. Ct. 293, 296 (65 L. Ed. 604); Central Trust Co. v. Garvan, 254 U. S. 554, 41 Sup. Ct. 214, 65 L. Ed. 403. In the Stoehr Case the court said:

"That Congress in time of war may authorize and provide for the seizure and sequestration through executive channels of property believed to be enemy-owned, if adequate provision be made for a return in case of mistake, is not debatable. Central Union Trust Co. v. Garvan, supra. There is no warrant for saying that the enemy ownership must be determined judicially before the property can be seized; and the practice has been the other way. The present act commits the determination of that question to the President, or the representative through whom he acts, but it does not make his action final. On the contrary, it distinctly reserves to any claimant who is neither an enemy nor an ally of an enemy a right to assert and establish his claim by a suit in equity unembarrassed by the precedent executive determination."

Important acts were passed by Congress in 1861 and 1862, during the Civil War, confiscating the property of the enemies of the government. Act Aug. 6, 1861, 12 Stat. 319, c. 60; Act July 17, 1862, 12 Stat. 589, c. 195. The legislation of 1862 was limited to the forefeiture of the life estate of the owner. As the act of 1862 originally passed Congress, President Lincoln thought the confiscatory features of it unconstitutional and intended a veto; his objection being that the forfeiture provisions extended beyond the life of the person whose estate was made subject to forfeiture, thus violating article 3, § 3 of the Constitution. Upon this coming to the knowledge of Congress, a joint resolution was passed by that body which declared that the proceedings under the act should not be so construed "as to work a forfeiture of the real estate of the offender beyond his natural life." See 12 Stat. p. 627. Thereupon the President approved the resolution and the act. See 145 U. S. 553, 12 Sup. Ct. 868, 36 L. Ed. 812. The constitutionality of the measure was sustained as a legitimate exercise of the war power of the government. See Miller v. United States, 11 Wall. 268, 20 L. Ed. 135; Jenkins v. Collard, 145 U. S. 546, 552, 12 Sup. Ct. 868, 36 L. Ed. 812.

[2] Under the Constitution the sole power of authorizing confiscation of enemy property is vested in Congress, and is an incident to its war powers. Article 1, § 8, cl. 11, gives the Congress the power:

"To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water."

We have already referred to the Act of Congress approved on October 6, 1917, known as the Trading with the Enemy Act. It is necessary to note some of its provisions. Section 7c of the act, as originally passed, provided as follows:

"If the President shall so require, any money or other property owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the alien property custodian." Comp. St. 1918, § 3115½d.

The amendment of November 4, 1918, made section 7 of the act of 1917 read, so far as it is relevant here, as follows:

(1) "Alien Property Custodian. Subsection (c) of section seven of the 'Trading with the Enemy Act,' approved October 6, 1917, is amended to read as follows:

"'(c) If the President shall so require any money or other property including (but not thereby limiting the generality of the above) patents, copyrights, applications therefor, and rights to apply for the same, trade-marks, choses in action, and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, any enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or the same may be seized by the Alien Property Custodian;. and all property thus acquired shall be held, administered and disposed of as elsewhere provided in this act.' * * *

"The sole relief and remedy of any person having any claim to any money or other property theretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian, or by the Treasurer of the United States." 40 Stat. pt. 1, c. 201, p. 1020 (Comp. St. Ann. Supp. 1919, § 3115½d).

It is to be observed that the amendment did two things: First, it specifically mentioned "choses in action and rights and claims of every character and description" as within the jurisdiction of the Alien Property Custodian; second, it gave him power to seize any property "owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy or an ally of an enemy not holding a license granted by the President herein, which the President after investigation shall determine is so owing or so belongs or is so held." Section 5 of the act of 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½c) also provided in part that "the President may exercise any power or authority conferred by this act through such officer or officers as he shall direct."

On February 26, 1918, the President, in the exercise of the power delegated to him as above, issued an executive order vesting in the Alien Property Custodian the executive administration of all of the provisions of subsection (c) of section 7 of the act of 1917, above set forth. And sul,division 2 of the executive order above mentioned vested in the aforesaid Custodian authority to make demands subject to the provision of subsection (c) of section 7. Subdivision 2 of this order may be found in the margin.[3]

³ (a) The Alien Property Custodian may make demand for the conveyance, transfer, assignment, delivery, and payment of any money or other property owing or belonging to or held for, by, on account of, or on behalf of or for the benefit of an enemy not holding a license granted by me or in the exercise of my power and authority, which the Alien Property Custodian after investigation, shall determine is so owing or so belongs or is so held, together with every right, title, interest, and estate of the enemy in and to such money or other property and every power and authority of the enemy thereover, including (but without limiting the generality of the foregoing) the power and authority to affirm, ratify, approve, revoke, repudiate or disapprove, in whole or in part, and at any time or times, any power, agency, trust or other relation at the time existing, and also any act of omission theretofore done in the exercise of or pursuant to any power, agency trust or other relation

281 F.—49

On December 3, 1918, the President issued a further executive order by which the Custodian's authority was extended to cover additional powers granted to the President under the amendment of November 4, 1918, to subsection (c) of section 7. Certain portions of the order may also be found in the margin.[4]    So that the Alien Property Custodian

which the enemy could or might lawfully revoke, repudiate, disaffirm, affirm, ratify or approve, and also including (but without limiting the generality of the foregoing) the power and authority to direct, supervise and control the future exercise of any power, agency, trust or other relation over such money or other property to the extent that the enemy could or might lawfully direct, supervise and control the same. Or the Alien Property Custodian may qualify or limit any such demand in such manner to such extent as he may in any case see fit and (without limiting the generality of the power to qualify and limit demands) he may in any case demand all or only such power and authority over the money or other property as he may see fit without demanding any conveyance, transfer, assignment, delivery or payment of such money or other property or any other right, title, interest, or estate therein or thereto except such as may be included within the power and authority demanded in the particular case over such money or other property.

"A demand for the conveyance, transfer, assignment, delivery and payment of money or other property unless expressly qualified or limited shall be deemed to include every right, title, interest, and estate of the enemy in and to the money or other property demanded as well as every power and authority of the enemy thereover.

"(b) Notice of any demand made by the Alien Property Custodian may be given to any person who, alone or jointly with others, may hold or have the custody or control of or may be exercising any right, power, or authority in or over or may be performing any duty concerning the money or other property mentioned in the demand; and, in any notice given, the Alien Property Custodian may require of the person notified the performance of any act or thing within the power of the person notified which may be necessary or proper to make the demand fully effective, or to establish proper acknowledgment, recognition, or evidence of the right, title, interest, and estate of the Alien Property Custodian in and to such money or other property and of the power and authority of the Alien Property Custodian thereover, and it shall be the duty of any person so notified to perform any act or thing so required    Such notice may be given in person or by mail.

"(c) When demand shall be made and notice thereof given, as hereinbefore provided, such demand and notice shall forthwith vest in the Alien Property Custodian such right, title, interest, and estate in and to and possession of the money or other property demanded and such power or authority thereover as may be included within the demand, and administer such money and other property in accordance with the provisions of the Trading with the Enemy Act and with any orders, rules, or regulations heretofore, hereby or hereafter made by me or heretofore or hereafter made by the Alien Property Custodian."

4 "I. I hereby vest in the Alien Property Custodian the executive administration of all of the provisions of subsection (c) of section 7 of said Trading with the Enemy Act, as amended by an act entitled 'An act making appropriations to supply deficiencies in appropriations for the fiscal year ending June 30, 1919, and prior fiscal years, on account of war expenses, and for other purposes,' approved November 4, 1918; and said Alien Property Custodian shall have the power and authority to prescribe forms and procedure for the exercise of the powers and authority vested in him.

"II. In the executive administration of said subsection (c) of section 7 of said Trading with the Enemy Act the executive orders heretofore issued by me by virtue of the authority vested in me by said Trading with the Enemy Act shall apply; and said Alien Property Custodian is hereby vested with all of the powers and authority heretofore granted to him or vested in him

is not only empowered, under certain circumstances, to seize the property of an alien enemy by the express provision of subdivision (c) of section 1 of the amendment of November 4, 1918, but a like authority is conferred upon him by the executive orders of the President to which we have referred.

[3] The property which may be so seized includes choses in action, and rights and claims of every character and description owing or belonging to or held for the benefit of any enemy not holding a license granted by the President, "which the President after investigation shall determine is so owing or so belongs or is so held." And this determination by the President is not necessarily a personal determination by him, as the Supreme Court held in Stoehr v. Wallace, supra. In that case it was definitely settled and declared that the President can act through the Custodian, and that the determination of the Custodian is in law the determination of the President. The decision in Central Trust Co. v. Garvan, supra, is equally decisive of that question.

A demand was made on July 30, 1918, by the Custodian on the trustees under the will of Dr. Schaefer. It stated that after investigation he had determined that Amalia Janner, "whose address is 113 Ringstrasse, Amberg, Bavaria, Germany, is an enemy (not holding a license granted by the President), and has a certain right, title, and interest in and to the estate of Dr. Louis Schaefer, deceased." It then continued as follows:

"I, as Alien Property Custodian, hereby require that every right, title, and interest of said enemy in and to the estate above described, including every power and authority thereover, shall be by you conveyed, transferred, assigned, delivered, and paid over to me, as Alien Property Custodian, to be by me held, administered, and accounted for as provided by law, and that any money or property now or hereafter held by you which the enemy may at any time or times, now or hereafter, be entitled to receive either upon or without demand, shall at such time or times be conveyed, transferred, assigned, delivered, and paid over to me, as Alien Property Custodian."

Then on February 4, 1921, a supplementary demand was made on the trustees. This supplementary demand read in part as follows:

"Amalia Janner, whose address is 113 Ringstrasse, Bavaria, Germany, is an enemy (not holding a license granted by the President), and has a certain right, title, and interest, as a beneficiary under the will of Dr. Louis Schaefer, deceased, in and to the estate of Dr. Louis Schaefer, deceased, and that such right, title, and interest of Amalia Janner in and to the estate of Dr. Louis Schaefer, deceased, is by you, in your capacity as trustees of the estate of said Dr. Louis Schaefer, deceased, owing to, or held for, by, or on account of, or for the benefit of, said Amalia Janner, an enemy.

"I, as Alien Property Custodian, do hereby seize every right, title, and interest of said enemy as such beneficiary in and to the estate above described, including every power and authority thereover, and do hereby require that every right, title, and interest of said enemy in and to the estate above described, including every power and authority thereover, shall be by you conveyed, transferred, assigned, delivered, and paid over to me, as Alien Property Custodian, to be by me held, administered, and accounted for as provided

by all executive orders heretofore issued by me not inconsistent with this order. * * *

"IV. The Alien Property Custodian is hereby authorized to take all measures and do all things that may be necessary or expedient to administer the powers and authority conferred by this order."

by law, and that any money or property now or hereafter held by you which the enemy might at any time or times, now or hereafter, be entitled to receive either upon or without demand, shall at such time or times be conveyed, transferred, assigned, delivered, and paid over to me as Alien Property Custodian."

The first demand was signed: "A. Mitchell Palmer, Alien Property Custodian, by J. L. Davis, Managing Director." The second demand was signed: "Francis P. Garvan, Alien Property Custodian." Each of these demands had affixed to it the official seal of the Custodian. The demand recited that "A. Mitchell Palmer, Alien Property Custodian," as duly appointed, qualified and acting under the Trading with the Enemy Act and the executive orders issued in pursuance thereof, and by virtue of the authority vested in him by said act and said executive orders. The supplementary demand contained a similar recital. with the necessary changes showing that the Custodian was acting under the Trading with the Enemy Act and the amendments thereto and the executive orders. Like specific demands upon the trustees were made respecting the right, title and interest of Helene Kyriss and Kurt E. Kyriss.

The right to the custody of the property herein involved vested in the Custodian became a vested right in him on the day when the demand was made and the notice thereof was given. This is so because of the express provision to that effect in the executive order of the President issued on February 26, 1918. The provision is found in paragraph 1, subdivision 2, clause (c), which is set forth elsewhere in this opinion. It declares that, when demand is made and notice given, "such demand and notice shall forthwith vest" in the Custodian the right, title, interest, and estate in the property demanded. The record discloses that the President, acting through the Custodian, has made the determination that the trustees hold certain property for the benefit of an alien enemy and that a demand for the surrender of the property has been made by the Custodian.

[4] The two trustees, Eugene Schaefer and Edwin W. Preston, who appeared, in their return asked that the petition be dismissed. They alleged that the third trustee, Dr. Ludwig Schaefer, had not been personally served with the order of the District Judge, or with a copy of the petition by which the proceeding was instituted, and had not appeared, and that he was a necessary and proper party to the proceeding. The objection that the third trustee is an indispensable party to this proceeding is without merit. It assumes that the trustees are entitled to a judicial hearing before the Custodian has a right to the possession of the property. This objection is untenable. The proceeding before the court is not an attempt to hold the trustees liable or to settle adverse claims. What the Custodian seeks by his petition is simply an order compelling the trustees to pay over to him income in their hands which in their statements made to him pursuant to law they admit having in their hands. Such income it was their duty, under the act of Congress, to turn over to the Custodian when the demand was made upon them by him, and this they were bound to do without any court order. But the failure of the trustees to comply with the Custodian's demand led him to avail himself of the remedy which section 17 of the

Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½i) gives him, and to ask the court for an order requiring the trustees to comply forthwith with the demand. The section referred to gives to the District Courts jurisdiction—

"to make and enter all such rules as to notice and otherwise, and all such orders and decrees, and to issue such process as may be necessary and proper in the premises to enforce the provisions of this act."

It certainly needs no argument to show that if the Custodian was entitled to make the demand for the delivery of the property he was equally entitled to resort to the District Court, if his demand was not complied with, for an order and decree requiring the delivery to be made as demanded, for the act itself expressly makes it the duty of the court to enforce the provisions of the statute. It is certainly true that section 17 was not intended to be a shield to be used by persons who are resisting compliance with the Custodian's demands, but rather as a sword against those who ignore the peremptory character of his action. As the Supreme Court declared in Central Trust Co. v. Garvan, supra, the section was not intended "to delay what the statute evidently means to accomplish at once." The court is not prevented from entering the order compelling compliance by the fact that only two of the three trustees are before the court, the third being absent in Europe. The will itself expressly provides that a majority of the trustees have power to act. The language of the will is, "The opinion of the majority of them shall prevail."

[5] The provisions of section 7c of the Act of October 6, 1917, particularly as amended by the Act of November 4, 1918, clearly provided for the seizure, not merely of legal estates, but of trust estates as well. In Keppelmann v. Keppelmann, 91 N. J. Eq. 67, 108 Atl. 432, the question whether the Custodian was entitled to seize a beneficial interest in trust property was directly presented to the New Jersey Court of Errors and Appeals. That court held it to be immaterial whether the legal title was in the enemy owner or whether it was held by another for his benefit, and certiorari in that case was refused by the Supreme Court in Keppelmann v. Palmer, 252 U. S. 581, 40 Sup. Ct. 392, 64 L. Ed. 727. In the above case the New Jersey court said:

"The manifest purpose of Congress was that the statute should operate, not only upon property the legal title to which is in the alien, but on all property held for him, or for his benefit, whether the legal title be in him or in the person who holds it for his benefit. In the present case, the property is held in trust by the complainants solely for the benefit of these three daughters of the testator, and comes within the very words of the statute, for although they are not the holders of the legal title to the trust estate, they are the equitable owners thereof; the whole beneficial interest being lodged in them."

And in Kahn v. Garvan (D. C.) 263 Fed. 909, and in Kohn v. Kohn (D. C.) 264 Fed. 253, it was specifically held that interests in trust estates were subject to seizure under the act. If there is any case in which a contrary conclusion was reached, it has escaped our attention.

[6] Any and all questions concerning any interest claimed by third persons in the property seized or demanded by the Custodian are to be raised and determined as provided by section 9 of the Trading with the

Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½e), and not in the proceeding now before the court. Section 7 of the act of 1917, as amended by the act of 1918 (section 3115½d), and which is set forth in an earlier 'part of this opinion, expressly declares that "the sole relief and remedy of any person having any claim to any money or other property" delivered to or required to be delivered to the Custodian or seized by him shall be that provided by the terms of the act. This is unambiguous, and certainly is sufficiently specific and definite.

[7] The demands of July 30, 1918, and of February 4, 1921, effected an immediate seizure of the property demanded. And the Custodian is in court now seeking to enforce the rights which he acquired by the seizure which he effected at the time of his demand. In Central Union Trust Co. v. Garvan, supra, the court declared that property required to be transferred by the act and property seized "stand on the same footing." The Custodian is in court now, not asking the court to make a seizure of this property in his behalf, but to aid him in enforcing a seizure he has already made.

In American Exchange National Bank v. Palmer (D. C.) 256 Fed. 680, the Custodian had served notice on the bank that a deposit made by one Simon in the bank for the benefit of one Albert, determined by the Custodian to be an alien enemy, was claimed by the said Custodian as a debt due to an enemy, and demanded that payment be made by the bank to the Custodian. The question was whether this was conclusive on the bank, or whether the bank could file a bill of interpleader against the Custodian and the bank's creditor, and have the matter determined in such a suit whether the Custodian was entitled to the money so deposited. The court allowed the bill of interpleader to be filed, and directed the bank to pay the money into court, and provided that upon such payment the bank should be discharged from liability either to the depositor or to the Custodian. In Garvan v. Certain Shares of International Agricultural Corporation (D. C.) 276 Fed. 206, Judge Mack refers to the above case, and says that in accordance with the views expressed in that case he had held in some cases that, where the Custodian came into the District Court requiring its aid for the seizure of property under section 17 of the Trading with the Enemy Act, he had held that the court had power to determine the adverse claims to the possession of the property, but that by the decision of the Supreme Court in Central Union Trust Co. v. Garvan, supra, the question had been settled adversely to the views expressed in American Exchange National Bank v. Palmer, supra.

The question came before this court in Garvan v. $20,000 Bonds, 265 Fed. 477. In that case the Custodian demanded certain securities in the hands of trustees and applied to the District Court for its aid to compel the delivery of them. The court below entered a decree in his favor, which we affirmed, and sustained the contention of the Custodian that under the statute he had the right conclusively to determine what property was liable to seizure as being that of an alien enemy. We there said:

"We agree with the Alien Property Custodian, and cannot read the perfectly plain language of section 7 (c) in any other way."

And we added that persons adversely affected by the seizure could take steps to protect their rights under section 9. The case went to the Supreme Court, which affirmed the decision below. 254 U. S. 554, 41 Sup. Ct. 214, 65 L. Ed. 403. Mr. Justice Holmes, writing for the court, declared it to be—

"plain that obedience to the statute requires an immediate transfer in any case within its terms without awaiting a resort to the courts."

And referring to the amendatory act of November 4, 1918, he said:

"This shows clearly enough the peremptory character of this first step. It cannot be supposed that a resort to the courts is to be less immediately effective than a taking with the strong hand."

He concluded by saying:

"The present proceeding gives nothing but the preliminary custody such as would have been gained by seizure."

[8, 9] But it is said that the Custodian's right to seize the property was a war-time power, which lapsed with the passing of a state of war, and that on November 11, 1918, an armistice was entered into between the armed forces of the United States and those of the then Imperial German government, and that on July 2, 1921, there became effective a joint resolution of Congress approved and signed by the President, which declared the state of war formerly existing with the Imperial German government to be terminated and at an end. This it is said rendered of no force or effect as to subsequent matters any prior determinations by the Alien Property Custodian to the effect that Helene Kyriss and Amalia Janner, or either of them, was or is an alien enemy; that the said Amalia Janner and Helen Kyriss are not alien enemies, and that neither of them is an alien enemy, and that each of them is a citizen or subject of a country with which the United States of America is at peace, and is entitled to all the protection to her property rights to which any alien is entitled within the United States, and also is entitled to all protection rights, privileges, and immunities, both as to personal and property rights appertaining to citizens or subjects of Prussia, of the sovereignty succeeding to the rights and place of Prussia under the treaties between Prussia and the United States.

We are unable to assent to the proposition. It is difficult to appreciate the reasoning upon which it is based. So long as the United States was officially at war, the courts cannot say that it was in reality at peace. The joint resolution of Congress adopted July 2, 1921, declared the war at an end. 42 Stat. 105. And on November 11, 1921, the President issued his proclamation, in which he declared "that the war between the United States and Germany terminated on July 2, 1921." Under the definition of the "end of the war," contained in the Trading with the Enemy Act, July 2, 1921, must be regarded for the purposes of that statute as the termination of the war.

On March 3, 1921, Congress passed a joint resolution declaring that the date of the passage of the resolution in the interpretation of any provision relating to the duration or date of the termination of the war should be treated as the date of the war's termination, excepting, how-

ever, from the operation and effect of the resolution certain acts, and among them the act known as the Trading with the Enemy Act, and all amendments thereto. The Congress thereafter passed a further joint resolution, which the President approved on July 2, 1921. It declared that the state of war existing between the United States and Germany was at an end, but that resolution specifically provided in section 5 as follows:

"All property of * * * German nationals which was on April 6, 1917, in or has since that date come into the possession or under control of, or has been the subject of a demand by the United States of America or of any of its officers, agents, or employees, from any source or by any agency whatsoever, * * * shall be retained by the United States of America and no disposition thereof made, except as shall have been heretofore or specifically hereafter shall be provided by law until such time as the Imperial German government * * * shall have * * * made suitable provision for the satisfaction of all claims." 42 Stat. 106.

As the demands made by the Custodian, and upon which this proceeding was instituted, were made after April 6, 1917, and prior to the adoption of this resolution, the Custodian's right to the possession of the property demanded may still be enforced. In Kahn v. Anderson, 255 U. S. 1, 41 Sup. Ct. 224, 65 L. Ed. 469, the Supreme Court declared that it was not disputable that complete peace had not come to pass by the effect of the Armistice and the cessation of hostilities. And Chief Justice White, speaking for the court, said it was difficult to appreciate the reasoning upon which it was insisted that, although the government was officially at war, nevertheless, so far as the regulation of the army was concerned, it was at peace.

In Vincenti v. United States (C. C. A.) 272 Fed. 114, the Circuit Court of Appeals for the Fourth Circuit, construing the words "the conclusion of the present war," held that the government was still at war at the time of its decision, which was on March 4, 1921. The Supreme Court refused a writ of certiorari. 256 U. S. 700, 41 Sup. Ct. 538, 65 L. Ed. 1178. And if a state of war legally existed on March 4, 1921, the seizure or demand by the Custodian made upon the trustees on February 4, 1921, was a legal seizure or demand under the Trading with the Enemy Act, which act did not expire until five months later.

[10] The petition which the Custodian filed asked the court to enter an order requiring the trustees to pay over the income of Helene Kyriss and that of Amalia Janner. The court below entered the order as requested. But section 9 of the Trading with the Enemy Act, as amended on June 5, 1920, authorizes an application to the President by one claiming any interest in property which has been transferred to the Custodian or seized by him for the return of the property, and empowers the President to order the return of such property to the claimant. It appears that Helene Kyriss made such an application to the President as respects her interest in the fund held for her by the trustees, and that the President granted the application. As Helene Kyriss at the time of her marriage was a citizen of the United States, and intermarried with a citizen of Germany prior to April 6, 1917, and the property involved was not acquired by her from a subject of Ger-

many, but from her father, who was a citizen of the United States, the President's right to grant the application cannot be questioned, as the facts brought the case within the express provisions of the statute.

[11] The answer interposed by the trustees did not allege that the application to the President had been granted, and, that fact not having been made to appear to the District Court, the order which the court entered, requiring the trustees to turn over the income, both that belonging to Helene Kyriss and that due to Amalia Janner, was valid and obligatory upon the trustees, and must be complied with, unless this court has authority to modify it under the circumstances now existing. Since the order was entered, the President has granted the application of Mrs. Kyriss, and counsel for the Custodian not only conceded the fact, but consented that the order might be modified, by denying the relief sought as respecting the amount due her. In view of these facts, the order must be modified accordingly. That this court has authority to make such a modification is clear.

We do not find it necessary to consider any other objections to the decree.

The decree, in so far as it relates ·to the property of Helene Kyriss, is reversed, with directions to dismiss the bill as to her. The decree, in so far as it relates to the property of Amalia Janner, is affirmed.