The Honorable Gary Sherrer Lt. Governor/Secretary of the Department of Commerce and Housing 700 S.W. Harrison Street, Suite 1300 Topeka, Kansas 66612
The Honorable John Ballou State Representative, 43rd District 19180 S. Waverly Gardner, Kansas 66030
The Honorable Tom Burroughs State Representative, 33rd District 3131 S. 73rd Terrace Kansas City, Kansas 66106
The Honorable Margaret E. Long State Representative, 38th District 1801 N. 126th Street Kansas City, Kansas 66109
Dear Secretary Sherrer and Representatives Ballou, Burroughs and Long:
Each of you has requested our opinion on questions relating to the construction and effect of 2001 House Bill No. 2573 (H.B. 2573).[1] We have received legal analyses and supporting documents on these requests from attorneys for the Oz Entertainment Company, the Unified Government, the Board of Public Utilities and the Oz Watchdog Group. Consolidated and summarized, the questions we are asked to address are as follows:
 1. Does H.B. 2573 result in a conversion of governmental grants to loans and, if so, is this improper?
 2. Does the term "Unified Government of Wyandotte County" in H.B. 2573 include the Board of Public Utilities?
 3. Does the Agreement executed by Oz and the BPU satisfy the requirement of H.B. 2573 to "reimburse the unified government of Wyandotte county for cash investment" "within 120 days of the effective date of [H.B. 2573]?"
 4. What level of discretion does the Secretary of Commerce and Housing have in determining whether the requirements of H.B. 2573 have been met?
 5. If the Secretary of Commerce and Housing determines Oz has not met the requirements of H.B. 2573, is the Kansas Development Finance Authority authorized to issue bonds to finance Oz's proposed project of statewide as well as local importance?
 I. BACKGROUND
Beginning in 1991, the Oz Entertainment Company (Oz) solicited funding from the government of Kansas City, Kansas and its Board of Public Utilities for design and feasibility costs for a proposed theme park and resort. (The developer of the proposed Wizard of Oz theme park and resort has undergone two name changes in the last ten years. In this opinion the developer will be referred to as Oz.) The park would be located in western Wyandotte County within the city limits of Kansas City, Kansas, and, according to correspondence from the company's president, would be based on the 1939 movie, The Wizard of Oz. Documents submitted by Oz's attorneys confirm that the Board of Public Utilities (BPU) approved a grant of economic development funds to Oz on November 6, 1991, in the amount of $400,000; additionally the City of Kansas City, Kansas (City) extended a $50,000 grant to the company for pre-development costs. In 1992, Oz solicited further funding from the BPU and the City, and also from Wyandotte County (County), to finance consulting fees required to develop a financial model for the proposed park. Oz received an additional $50,000 from the City and, apparently, a $50,000 grant from the County. Both these grants, as well as the original grants, were made as reimbursements for funds expended and were conditioned on proof that Oz had actually spent money for services performed. A memorandum of understanding (MOU) between the City and Oz affirmed that the grants were not to be construed as loans unless the funds were spent in a manner contrary to the MOU. All documentation we received reflects that Oz met the conditions for receiving the grants, and that the three entities extended economic development grants to Oz in the total amount of $550,000: $400,000 from the BPU, $100,000 from the City of Kansas City and $50,000 from Wyandotte County. Subsequently, and for reasons not relevant to these opinion requests, negotiations between these entities and Oz collapsed, and, sometime during 1996 or 1997, Oz began negotiating with Johnson County officials about an alternative site for its theme park.
The legislative history of the 1998 session contains extensive discussions about the proposed Oz theme park and references the former Sunflower army ammunition site in Johnson County as a second possible location. Substitute for Senate Bill No. 675 was introduced on February 17, 1998, defining a "project of statewide as well as local importance" to specifically include the proposed Oz park and resort.[2] The bill, as introduced, authorized the Kansas Development Finance Authority (KDFA) to issue bonds to finance the project, and identified the various revenue sources available to repay such bonds: real property tax increments, state transient guest taxes, state sales taxes, and state compensating use taxes. All of these taxes were to be collected within the development area.
During a meeting of the House Committee on Tourism on April 9, 1998, Skip Palmer, president of Oz, presented a slide show to the members. The text of the slide show is included in Committee minutes.[3] Mr. Palmer outlined the features, feasibility and financing of the proposed park, including a request for $210,000,000 of Sales tax accelerated revenue (STAR) bonds to be issued by KDFA. Mr. Palmer indicated Oz preferred the Wyandotte County site for the park. In material distributed at the meeting and written in question and answer format, the question was posed, "Will the Unified Government of Kansas City and Wyandotte County be reimbursed for the grant funds provided for the initial feasibility study?" The answer was a blackened box, next to a designated "Yes."[4]
That same day, on motion of Representative Tom Burroughs of Kansas City, Kansas, the House Committee of the Whole amended Substitute for Senate Bill No. 675 to include a requirement that the developer pay $1,500,000 to local governments that had invested in the project.[5] This version was amended by the Senate Committee of the Whole,[6] and the final version of the bill that passed in both houses included the following language: "Within one year of the commencement of construction of any project of statewide as well as local importance as defined in K.S.A.74-8902 and amendments thereto . . . a developer shall reimburse the unified government of Wyandotte county for cash investment in the project and for the use of [sic] during the course of negotiations with the developer as documented to and determined by the secretary of commerce and housing."[7] The section was codified as K.S.A. 74-8930.
In the 1999 legislative session, amendments to the Oz legislation made clear that Johnson County was to be the location for the proposed park, and outlined the regulatory procedures to be imposed during environmental clean-up of the former Sunflower army ammunition plant, which was the proposed site.[8] The bill also enhanced and refined the earlier language regarding financing the bond repayment fund. Section 10 of the bill deleted the phrase "and for use of [sic] during the course of negotiations with the developer" from K.S.A. 74-8930; Oz would no longer be negotiating with officials in Wyandotte County.
The language at issue in this opinion is found in the most recent amendment to K.S.A. 2000 Supp. 74-8930. The 2001 Legislature heard testimony from many conferees on whether the statutory deadline for approval of the redevelopment plan by the Johnson County Commission should be extended from July 1, 2001 until July 1, 2002, thereby giving Oz officials renewed opportunities to gain the Commission's support, because Oz had been thus far unsuccessful in gaining the necessary votes from the Commission for approval of the plan to enable them to move on to the next stages of the process.[9] On March 26, 2001, Representative Burroughs introduced an amendment to House Bill No. 2573. He moved to insert an additional section to amend K.S.A. 74-8930, which would read in final version:
 "Within 120 days of the effective date of this act, [sic] developer of a project of statewide as well as local importance shall reimburse the unified government of Wyandotte county for cash investment in the project as documented to and determined by the secretary of commerce and housing."
Representative Burroughs also proposed amending the extension language in the bill's renumbered section two by proposing replacement of the term "2002" as the deadline for Johnson County's approval of Oz's redevelopment plan with "2001, or, if a developer has complied with the provisions of K.S.A. 74-8930 and amendments thereto, 2002." The bill was to be effective upon publication in the statute book on July 1, 2001.[10]
The House passed this amended version on March 27, 2001; the Senate passed the House's version of the bill on April 6, 2001.
Subsequently, the BPU and Oz negotiated an agreement under which Oz promised to repay the $400,000 under certain conditions. The final agreement, dated July 26, 2001, was prepared jointly by BPU and Oz attorneys. The recitals state that the issuance of STAR bonds is preconditioned on approval of the redevelopment plan by Johnson County before July 1, 2001, acknowledging that the 2001 Legislature extended that deadline to July 1, 2002, on the condition that "Oz comply with several requirements, including reimbursement of cash investments in the Project provided to the Unified Government of Wyandotte County/Kansas City, Kansas, including BPU." Another recital reads, "Oz agrees that it is obligated to reimburse BPU the sum of $400,000 in project development expenses." The body of the agreement requires Oz to provide BPU with a promissory note and to "reimburse," by July 1, 2002, the $400,000 plus interest unless Oz and the BPU enter an agreement for electric utility services for the project, in which event the $400,000 will be added to the electric utility service rate structure. Failure of Oz to engage the BPU or provide BPU with "written notice that it does not wish to pursue negotiations for an exclusive electric service agreement" would result in an obligation to pay the BPU the amount of $1,200,000.
According to newspaper accounts and information provided to this office, Oz has transmitted a check for $150,000 to the Unified Government for repayment of the City and County portions of the grants. Thus, only the $400,000 grant paid by the BPU is now at issue.
 II. DISCUSSION
A. Does H.B. 2573 Result in Conversion of Governmental Grants to Loans and if so, is this Improper?
Properly enacted legislation is presumed valid unless it contravenes an express constitutional prohibition or one necessarily implied from an affirmative prohibition.[11] The Legislature is presumed to have acted within its constitutional power.[12] "The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the Constitution."[13] "In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done."[14]
In addition, the Legislature has the authority to "pass a law whose operation is by its terms made to depend on a contingency. . . ."[15]
This means the Legislature is empowered to make a law "to become operative on the happening of a certain contingency or future event."[16]
The original transaction between the governmental entities (now consolidated as the Unified Government of Kansas City/Wyandotte County) and Oz was the granting of economic development monies. Oz met the terms required to secure the grant funds and the three grantors, in turn, transferred money to Oz beginning in the early 1990's. Then, in 1998, Oz officials came to the Kansas Legislature asking for a series of State benefits and resources, including the issuance of STAR and TIF bonds by KDFA, to substantially assist in financing the project, and for the commitment of various state taxes as revenue sources to repay the bonds. To induce the Legislature to pass the enabling laws for its project, Oz offered repayment of the Unified Government grant funds as an express component of its legislative proposal. The repayment requirement was duly included in the final version of the bill,[17] but could only be triggered by actual construction of the project (with a one-year cushion), at which point the State would have met its own obligations to Oz to execute the requested financing mechanisms. In 1999, the Legislature made a further commitment to Oz to oversee the extensive environmental remediation of the Sunflower site, and the only amendment to K.S.A. 74-8930 was a recognition that Johnson County, not Wyandotte County, was now the planned project location.
Finally, in 2001, Representative Burroughs amended the time extension language; the extension was made expressly contingent on Oz's reimbursement of the three grants. Construing the statute to withstand constitutional scrutiny, as is required, it appears to us that the Legislature in the 2001 amendment struck its own "quid pro quo" arrangement with Oz. The Legislature did not unilaterally order the repayment of an unconditional grant; rather, it gave the developer one more year to convince Johnson County Commissioners to approve the Oz plan, if it made certain payments within a specified time frame. The Legislature's intent in this regard must have been evident to Oz officials. The agreement between Oz and the BPU recognizes that the time extension was expressly conditioned on, among other requirements, reimbursement of the three cash grants.
It seems that Oz chose to use repayment of these grants as part of its bargaining capital to convince the Legislature to enact laws that would allow development of its park and resort using significant State resources. The Legislature ultimately used these grant funds as a trade off for the legislative package, and conditioned the extension of the time needed to gain approvals for the redevelopment plan on their repayment. We conclude, therefore, that H.B. 2573 is a conditional statute, making repayment of the Unified Government grants a contingency for time extension, and, as such, the law is a proper and constitutional exercise of legislative power.
B. Does the Term "Unified Government of Wyandotte County" in H.B. 2573 Include the Board of Public Utilities?
The paramount rule of statutory construction is that the intent of the Legislature governs where it can be ascertained.[18] If a statute is ambiguous, its historical background, circumstances attending its passage, the purpose to be accomplished and the effect of the statute under various circumstances may be examined.[19]
The BPU has long been recognized as an administrative agency of the Kansas City, Kansas government. It has no independent powers to sue or be sued in its own name; its attorney was employed by the City, and now by the Unified Government; the City treasurer was made the ex officio treasurer of the BPU.[20] Unification of the Kansas City and Wyandotte County governments did not alter the structure of the BPU. It is now an administrative agency of the Unified Government of Kansas City, Kansas.[21]
We find no intent in the language of K.S.A. 2000 Supp. 74-8930 to distinguish the governing entity from its administrative agency. Moreover, there is no logic in construing either the 1998 legislation or the 2001 amendment to require repayment of the two smaller grants, but exclude the larger one. The three grants were sought and extended as part of a single financing package to Oz in the early 1990's when Wyandotte County was slated to receive the benefits of an Oz park. All subsequent legislation and amendments attach equally to each of the three grants. In fact, based on the language of the BPU/Oz agreement, it seems to us that both parties understood and assumed that the reimbursement language included the BPU grant ("[t]he Legislature amended the statute . . . including reimbursement of cash investment in the Project provided by the Unified Government of Wyandotte County/Kansas City, Kansas, includingBPU").[22]
We conclude that a common-sense construction, as reflected by legislative intent and the clear language in the agreement between the affected parties, would include the BPU in the phrase "unified government of Wyandotte county" as used in K.S.A. 2000 Supp. 74-8930 and its amendments.
C. Does the Agreement Executed by the Oz Entertainment Company and the BPU Satisfy the Requirement of H.B. 2573 to "reimburse the unified government of Wyandotte county for cash investment" "within 120 days of [July 1, 2001]?"
In addition to the rules of statutory construction cited earlier, any construction of K.S.A. 2000 Supp. 74-8930, as amended, must consider the entire act,[23] must give words their common and ordinary meanings,[24]
and should not interpret a provision to contravene the manifest purpose of the act.[25] Ordinarily, identical words in different statutes are interpreted to have the same meaning absent an indication to the contrary.[26]
The narrow issue here is whether the agreement between the BPU and Oz satisfies the statutory directive to "reimburse" the three grants within 120 days of July 1, 2001. Focusing on the plain language of H.B. 2573 and giving effect to all the words used, the explicit and fixed time limit set for reimbursement precludes a mere promise to reimburse with an extension of the repayment period (notwithstanding the additional consideration and interest). The language of Section 1 of the bill, a prerequisite to Oz moving forward with its efforts in Johnson County, places a firm deadline on the reimbursement of funds to the three original grantors. The bill's history reflects a legislative intention to have the payment made and conditional extension granted by October 29, 2001. An arrangement to repay or to provide in-kind consideration beyond the deadline, regardless of how beneficial that might be to the BPU, contravenes the Legislature's straightforward directive. The 2001 Legislature did not leave the BPU or Oz this degree of latitude or discretion.
The term "reimburse" is widely used in Kansas statutes. K.S.A. 79-1120
requires the director of taxation to reimburse certain taxes pursuant to judicial order. K.S.A. 65-34,130 entitles an owner/operator of an aboveground petroleum storage tank to reimbursement from the aboveground fund for corrective action taken. K.S.A. 75-4301a exempts reimbursement of reasonable expenses from prohibited compensation under public ethics laws. K.S.A. 73-1217 permits secondary schools to file a claim for reimbursement of tuition and fee amounts with the Veteran's Commission. In none of these statutes, nor in the others we reviewed, can the term "reimburse" be interpreted to mean anything other than direct repayment of expended funds. Likewise, Attorney General Opinion No. 80-21 defines "reimbursement" as meaning "to pay back, to make restoration, to repay that expended."
Although we did not find any applicable Kansas cases, a Louisiana appellate court also defines the term as "to pay back that expended, to indemnify, or to make whole."[27] The American Heritage Dictionary defines "reimburse" as "to repay"; "repay" is defined as "to pay back (money); refund."[28] Black's Law Dictionary similarly defines the term as "repayment" and "indemnification."[29] A promissory note, even combined with an option to contract for services, does not meet this definition of "reimbursement."
Based on legislative intent, as derived from the language and the conditions surrounding passage of H.B. 2573 and from the common usage of the term, we conclude that the term "reimbursement," as used in K.S.A. 2000 Supp. 74-8930, as amended, requires that Oz transmit a monetary payment to the BPU before October 29, 2001, in order to gain the one-year extension of its approval process.[30]
D. What Level of Discretion does the Secretary of Commerce and Housing Have in Determining Whether the Requirements of H.B. 2573 have been Met?
Under K.S.A. 2000 Supp. 74-8930, compliance with the reimbursement requirement must be "documented to and determined by the secretary of commerce and housing." H.B. 2573 did not amend this provision. Because the Legislature is empowered to enact a contingent law, the determination of that contingency as fact may be ascertained by a state officer.[31]
Although the 2001 Legislature delegated the determination of Oz's proper and timely reimbursement to the Secretary of Commerce and Housing (Secretary), he has narrow parameters within which to make his decision.[32] The Secretary may determine if the payment to the BPU was, in fact, transferred and whether it was made within 120 days of July 1, 2001. The Secretary has no discretion, however, to permit Oz to avoid repayment or to make repayment of the $400,000 at a later date, without Oz losing the benefit of an extension; the Legislature provided specific guidelines for obtaining the conditional extension in the language it used in H.B. 2573.
We conclude that the Secretary's discretion only extends to the type of documentation he requires to satisfy himself that the $400,000 has been repaid to the BPU within 120 days of July 1, 2001. If he determines this has been done, Oz has automatically earned the extension of time for it to gain Johnson County approval.
E. If the Secretary Determines Oz has not Met the Requirements of H.B. 2573, is the Kansas Development Finance Authority (KDFA) Authorized to Issue Bonds to Finance Oz's Proposed Project of Statewide as well as Local Importance?
Under the analysis provided in the previous sections, we conclude that if the Secretary determines that Oz has not repaid the BPU the amount of $400,000 within 120 days of July 1, 2001, then the time extension for Johnson County to approve Oz's redevelopment plan is not triggered. If Johnson County does not approve the redevelopment plan within the applicable time frame, KDFA cannot adopt the plan and, consequently, has no authority to issue bonds for the project.
We therefore conclude the Secretary must verify that Oz has met its statutory repayment deadline. If the Secretary does not render this verification, Oz cannot continue forward in its approval process and, ultimately, cannot benefit from KDFA bond issues.
 III. CONCLUSION
The 2001 Legislature amended K.S.A. 2000 Supp. 74-8922 and 74-8930 to make repayment of three previously awarded Unified Government grants to Oz a precondition to gaining a one-year time extension for securing Johnson County's approval of the Oz redevelopment plan. This conditional legislation was a proper exercise of the Legislature's powers. Oz has repaid two of the grants, and executed an agreement with the BPU to repay the $400,000 grant in cash or in-kind by July 1, 2002. To the extent the agreement permits repayment of the grant beyond the statutory deadline of October 29, 2001, or permits a method other than monetary repayment, the agreement does not meet the contingency of H.B. 2573 for realizing the extension. Unless Oz can document to the Secretary that the $400,000 has been repaid in a timely manner, the time deadline for gaining Johnson County approval becomes July 1, 2001. Without approval of the redevelopment plan by the Johnson County Commission, KDFA cannot issue TIF or STAR bonds for the proposed project.
Very truly yours,
 CARLA J. STOVALL Attorney General of Kansas
 Nancy L. Ulrich Assistant Attorney General
CJS:JLM:NLU:jm
[1] L. 2001, Ch. 132.
[2] L. 1998, Ch. 199, § 1.
[3] Minutes, House Committee on Tourism, April 9, 1998, Attachment 1.
[4] Id.
[5] 1998 Journal of the House 1788 (April 9, 1998).
[6] 1998 Journal of the Senate 1880 (May 3, 1998).
[7] L. 1998, Ch. 199, § 23.
[8] L. 1999, Ch. 158, § 10.
[9] Attorney General Opinion No. 2001-12 describes the many statutory steps Oz must follow to reach the point where KDFA can issue STAR and tax increment financing (TIF) bonds to finance the project.
[10] 2001 Journal of the House 580 (March 26, 2001).
[11] Hicks v. Davis, 97 Kan. 312, 315 (1916).
[12] Aves By and Through Aves v. Shah, 258 Kan. 506, 525 (1995), quoting Leiker v. Gafford, 245 Kan. 325, 363 (1989).
[13] Leiker v. Employment Security Bd. of Review, 8 Kan. App. 2d 379,384 (1983).
[14] City of Baxter Springs v. Bryant, 226 Kan. 383, Syl. ¶¶ 1-2, (1979).
[15] City of Pittsburg v. Robb, 143 Kan. 1 (1936).
[16] State v. Dumler, 221 Kan. 386, 391 (1977).
[17] K.S.A. 2000 Supp. 74-8930.
[18] Danisco Ingredients USA, Inc. v. Kansas City Powers LightCo., 267 Kan. 760, 772 (1999).
[19] Board of Sedgwick County Comm'rs v. Action Rent to Own, Inc.,266 Kan. 293, 301 (1998).
[20] Charter Ordinance 106, Kansas City, Kansas, passed February 21, 1991; Attorney General Opinion No. 81-93.
[21] K.S.A. 2001 Supp. 12-340 et seq.
[22] Emphasis added.
[23] Danisco, 267 Kan. at 772.
[24] Aves, 258 Kan. at 512.
[25] Id.
[26] Swartz v. Swartz, 20 Kan. App. 2d 704, 706 (1995).
[27] Washington Nat. Ins. Co. v. Brown, 654 So. 724, 727 (La.App. 1 Cir. 1995).
[28] American Heritage Dictionary 1097, 1102 (7th Printing, 1971).
[29] Black's Law Dictionary 772 (7th Edition 1999).
[30] While the statute uses the term "cash investment," rather than "grants," the legislative history since 1998, as reflected in the agreement between Oz and the BPU, is clear that the Legislature was referring to the grants extended by the Unified Government entities.
[31] Dumler, 221 Kan. at 392.
[32] Attorney General Opinion No. 2001-12 at 4.